1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   OCULU, LLC,                    ) Case No. SACV 14-0196-DOC (JPRx)
                                    )
12                  Plaintiff,      )
                                    ) REPORT AND RECOMMENDATION OF U.S.
13        vs.                       ) MAGISTRATE JUDGE
                                    )
14   OCULUS VR, INC., et al.,       )
                                    )
15                  Defendants.     )
     ┌─────────────────────────────┐)
16

17        This Report and Recommendation is submitted to the Honorable

18   David O. Carter, U.S. District Judge, under 28 U.S.C. § 636 and

19   General Order 05-07 of the U.S. District Court for the Central

20   District of California.

21                          **PROCEEDINGS**

22        On March 2, 2015, Defendant Oculus VR, Inc., filed a motion

23   for contempt and sanctions.[1]  Defendant asserts that Plaintiff

24   Oculu, LLC, failed to produce (1) an Excel spreadsheet that

25   tracked free-trial customer signups; (2) an electronic MySQL

26

27   ────────────────────

28        [1]Under Judge Carter's July 21, 2014 scheduling order,
     discovery closed on February 24, 2015.

                                    1

database showing people who had signed up for free or paid accounts on Plaintiff's website; (3) emails Plaintiff's vice president of sales and former president, Robert Ardell, received each time a free or paid membership was generated at oculu.com; (4) an email sent to Plaintiff's chief technology officer, David Winters, from an attorney of one of Plaintiff's clients, in which the attorney commented on his confusion between the parties' products; and (5) an intern's PowerPoint presentation explaining reasons for choosing the name "Oculu" and how it was different from "Oculus." (Mem. P. & A. Supp. Mot. Contempt & Sanctions at 5-6, 9-14.) Defendant further contends, based on deposition testimony that the MySQL database was sometimes purged of data, that Plaintiff "may have engaged in spoliation of evidence." (Id. at 6, 14.) Finally, Defendant argues that Plaintiff failed to produce a privilege log or "identify a single privilege communication that has been withheld." (Id. at 19.)

Defendant asks that the Court find Plaintiff in violation of its obligations under the Federal Rules and the undersigned's December 2, 2014 and January 15, 2015 orders. It asks that the Court preclude Plaintiff from offering any argument, evidence, or testimony regarding (1) its client's attorney's "confusion" concerning Plaintiff and Defendant; (2) its free-trial and paid-subscription customers or conversion of free-trial customers to paid customers; and (3) its "actual damages theory (namely that Defendant's conduct allegedly caused a reduction in free trials and paid conversions)," or, alternatively, find that Defendant is entitled to an adverse inference that the data would contradict Plaintiff's conclusions and expert-witness testimony regarding

2

damages. (Id. at 23-24.) Defendant further asks the Court to find that Plaintiff's failure to produce a privilege log waives any privilege "as to its written communications with former or current counsel relating to its trademark application, its decisions whether to enforce its alleged trademark rights, its demand letter to Defendant, the allegations in its Complaints in this case, and its press releases relating to this litigation" and order Plaintiff to "produce all such communications." (Id.) Finally, Defendant asks for reasonable attorney's fees and costs in bringing the motion. (Id.)

On March 9, 2015, Plaintiff filed opposition to the motion, and on March 16, Defendant filed a reply. On March 27, 2015, Judge Carter referred the matter to this Court for a report and recommendation. For the reasons stated below, the Court recommends that the motion be granted in part and denied in part.

**DISCUSSION**

I.   <u>Meet and Confer</u>

As an initial matter, Plaintiff contends that Defendant's motion must be dismissed because Defendant failed to meet and confer as required by Local Rule 7-3. (Opp'n Mot. Contempt at 3.) Local Rule 7-3 states that

> counsel contemplating the filing of any motion shall first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution. The conference shall take place at least seven (7) days prior to the filing of the motion. If the parties are unable to reach a resolution which eliminates the necessity for a

3

hearing, counsel for the moving party shall include in the notice of motion a statement to the following effect: "This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on (date)."

On February 19, 2015, 11 days before filing the instant motion, Defendant's counsel emailed and mailed a letter to Plaintiff's counsel requesting a meet-and-confer regarding the motion. (Peterson Decl., Ex. 3.) Between February 23 and 27, 2015, counsel for both parties exchanged several emails regarding the evidence at issue. (<u>Id.</u>, Ex. 4; Taillieu Decl., Ex. 3.) On March 2, 2015, Defendant filed the instant motion.

Defendant sufficiently complied with Local Rule 7-3 by sending the meet-and-confer letter 11 days before filing its motion and discussing the disputed issues over email in the ensuing days. <u>See</u> <u>JAT Wheels Inc. v. JNC Wheel Collection</u>, No. CV 14-04898 JVS (MRWx), 2014 WL 4568323, at *2 n.1 (C.D. Cal. Sept. 8, 2014) (finding email exchange between counsel over two days discussing basis for motion sufficient to satisfy Local Rule 7-3's meet-and-confer requirement); <u>see also</u> <u>Hoffman v. Constr. Protective Servs., Inc.</u>, 541 F.3d 1175, 1179 (9th Cir. 2008) (as amended) (finding "motion relating to sanctions pursuant to Rule 37" not subject to Local Rule 37-1's conference requirement). It also noted in its Notice of Motion that it had attempted to comply with Local Rule 7-3. (<u>See</u> Notice Contempt Mot. at 4.) As such, dismissal of Defendant's motion based on its alleged failure to meet and confer is not warranted.

4

II. <u>Plaintiff's Compliance with the Court's Orders and Federal Rule of Civil Procedure 26</u>

Defendant contends that Plaintiff violated the undersigned's December 2 and January 15 discovery orders "through failure to produce documents it was ordered to produce, and by its continued failure to produce documents in native format." (Mem. Contempt Mot. at 11.) Defendant further contends that Plaintiff "violated its Rule 26(a) obligations by not producing documents and data 'bearing on the nature and extent' of Plaintiff's claimed damages (*i.e.* newly-revealed free trial and conversion data)." (<u>Id.</u>)

A. <u>Applicable law</u>

Federal Rule of Civil Procedure 26 requires a party "to make certain initial disclosures to [other parties] 'without awaiting a discovery request.'" <u>R & R Sails, Inc. v. Ins. Co. of Pa.</u>, 673 F.3d 1240, 1245 (9th Cir. 2012) (quoting Fed. R. Civ. P. 26(a)(1)(A)). Under Rule 26(a)(1)(A)(iii), those initial disclosures must include

> a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered . . . .

<u>See also</u> Fed. R. Civ. P. 26 advisory committee's note to 1993 amends. Rule 26(e)(1)(A) further requires disclosing parties to supplement their prior disclosures "in a timely manner" when a prior response is "incomplete or incorrect."

Rule 37(c)(1) "forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." Hoffman, 541 F.3d at 1179 (internal quotation marks omitted). Such exclusion of evidence is appropriate unless the failure to disclose was "substantially justified or . . . harmless." Fed. R. Civ. P. 37(c)(1); R & R Sails, 673 F.3d at 1246. "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." R & R Sails, 673 F.3d at 1246. In addition to or instead of an exclusionary sanction, the court may order payment of reasonable expenses, including attorney's fees; inform the jury of the party's failure; or "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)." Fed. R. Civ. P. 37(c)(1)(C).

Under Rule 37(b)(2)(A), when a party fails to obey an order to provide discovery, a court may sanction it by issuing "just orders," including

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in

part;

(vi) rendering a default judgment against the disobedient

party; or

(vii) treating as contempt of court the failure to obey

any order except an order to submit to a physical or

mental examination.

Rule 37(b)(2)(C) provides that "[i]nstead of or in addition to"

the sanctions under subsection (A), "the court must order the

disobedient party, the attorney advising that party, or both to

pay the reasonable expenses, including attorney's fees, caused by

the failure, unless the failure was substantially justified or

other circumstances make an award of expenses unjust."

"Rule 37(b)(2) contains two standards — one general and one

specific — that limit a district court's discretion." Ins. Corp.

of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 707

(1982).  First, any sanction must be "just"; second, it must be

"specifically related" to the claim or defense at which the

discovery was directed.  Id.; see also Moe v. Sys. Transp., Inc.,

No. CV 09-157-M-DWM-JCL, 2010 WL 4736292, at *2 (D. Mont. Nov.

16, 2010).  Sanctions may be appropriate even if the offending

party ultimately complied with the discovery order.  Fair Hous.

of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002).

B.  Discussion

1.  *Excel Spreadsheet, MySQL Database, and Sign-Up*

*Emails*

Defendant contends that sanctions are warranted because

Plaintiff failed to produce: (1) an Excel spreadsheet tracking

individuals who signed up for free trials on its website; (2) an

electronic MySQL database that "tracks every person who has signed up for an account with Plaintiff's website (whether free trial or paid subscription)"; and (3) emails Ardell received each time a consumer signed up on oculu.com for a free trial or paid membership.[2]  (Mem. Contempt Mot. at 5-6.)  Defendant contends that it first learned of these documents during various depositions, and that they are responsive to RFP numbers 131, 132, 135, and 136, which were the subject of the undersigned's January 15 Order granting Defendant's second motion to compel. (Id.)  Defendant further contends that these documents are "of central importance to Plaintiff's actual damages theory, which relies on an alleged loss of traffic to its website, a loss of free trial sign-ups, and supposedly, a lower conversion of free trial customers to paying ones."  (Id. at 6.)

Indeed, Plaintiff appears to have violated the January 15

---

[2]Defendant contends that Plaintiff violated the Court's orders "by its continued failure to produce documents in native format." (Mem. Contempt Mot. at 11.)  To the extent Defendant refers to the emails sent to Ardell when a person registered on oculu.com for a free or paid membership (see id. at 12 (contending that free-trial and paid-account sign-up emails "were not timely produced, let alone in native format")), sanctions are not warranted because Plaintiff apparently has now provided them to Defendant in native format (see Peterson Conf. Reply Decl., Ex. 22 at 597 (John Cecil testimony that emails had been provided in native format)).  To the extent Defendant refers to emails that were previously produced in PDF format and were the subject of Defendant's December 24, 2014 motion for sanctions (Mem. Contempt Mot. at 12 (arguing that Ardell "testified that he maintained all of his emails in native format, but — as addressed in Defendant's [December 24] Motion for Sanctions — Plaintiff converted the emails and produced them in PDF (non-native format)" (citation omitted))), the undersigned already declined to award sanctions based on Plaintiff's failure to produce the emails in native format in her March 3, 2015 Order (see Mar. 3, 2015 Order at 2-3).  Defendant has proffered no reason for the Court to revisit that Order here.

Order in failing to produce the Excel spreadsheet, MySQL database, and sign-up emails. In its December 24, 2014 motion to compel, Defendant argued that Plaintiff should be ordered to produce documents

> showing Plaintiff's website's conversion rate — meaning the rate at which consumers visit Plaintiff's oculu.com website and become paying customers (Request No. 131); the conversion rate of customers who sign up for a "free trial" and then become paying customers (Request No. 132); the number of customers each year who sign up for Plaintiff's various membership plans, which carry different monthly fees (Request No. 135); and documents showing the average time a paying customer remains a customer of Plaintiff (Request No. 136).

(Dec. 24, 2014 J. Stip. Re Mot. Sanctions & Mot. Compel at 16; <u>see also</u> Dec. 24, 2014 Peterson Decl., Ex. 1 (Pl.'s Resps. Second Set RFPs).) On January 15, 2015, the undersigned granted Defendant's motion to compel, ordering Plaintiff to "produce all documents responsive to RFP Nos. 131, 132, 135, and 136" within seven days of the date of the Order. (Jan. 15, 2015 Order at 2.)

Plaintiff's Excel spreadsheet, MySQL database, and sign-up emails are responsive to RFP numbers 131, 132, 135, and 136, as they show the names of customers who signed up for free or paid subscriptions on oculu.com and resulting account information. Although Plaintiff contends that the documents do not independently show any "conversion rate" of free-trial customers to paying customers (<u>see</u> Opp'n Mot. Contempt at 7-8, 10), they can clearly be used to determine Plaintiff's conversion rate by

simply comparing the listed free-trial customers with the listed paid-subscription customers. The Excel spreadsheet, MySQL database, and sign-up emails are therefore among the data "sufficient to show Oculu's conversion rate," as requested in Defendant's RFPs, and should have been produced under the January 15 Order. (See Peterson Decl., Ex. 1 at 17-20 (Pl.'s Feb. 9, 2015 Supp. Resps. to RFP Nos. 131, 132, 135, & 136).)[3]

The data also should have been produced under Rule 26 because they underlie Plaintiff's calculation of damages. Plaintiff's damages expert opined that Plaintiff lost revenue because Defendant "crowd[ed] [Plaintiff] out of relevant search engine results" and that Plaintiff "would have earned the lost revenue by converting these missing inbound opportunities" into accounts. (Peterson Conf. Decl., Ex. 14 at 11-12.) He asserted that Plaintiff had previously "averaged approximately 100 free trials each month, of which approximately 15 percent were typically converted into ongoing customers with associated revenue," but that after Defendant's mark became "widely known, the number of free trials dropped to approximately 20 per month," equaling "360 lost accounts since [Defendant] became a sensation in June 2012." (Id. at 12.) The expert calculated damages based on those "missed free trial conversion opportunities."[4] (Id.)

_____

[3]Because this exhibit is not sequentially paginated, the Court uses the numbering provided by its Case Management/Electronic Case Filing system.

[4]Plaintiff's president, John Cecil, testified that the only way to determine the number of free-trial signups would be to go through the sign-up emails generated during a particular time frame. (Peterson Conf. Reply Decl., Ex. 22 at 597-98.) Thus,

Thus, the information showing Plaintiff's free-trial and paid-membership signups over time underlies Plaintiff's calculation of damages and should have been produced. Plaintiff's counsel's repeated representations during the discovery process that the conversion rate was "irrelevant" only makes his failure to produce even more egregious. (See Dec. 24, 2014 Mot. Sanctions J. Stip at 18; Dec. 24, 2014 Peterson Decl., Ex. A at 13-16 (Pl.'s Resp. RFPs).)

Plaintiff contends that sanctions are unwarranted because it had believed that its production of its Quickbooks data "ended the inquiry" into its free- and paid-subscription customers. (Opp'n Mot. Contempt at 6-7.) But Plaintiff's president, John Cecil, testified that the conversion rate for free-trial to paying customers was not reflected in the Quickbooks data (Peterson Conf. Reply Decl., Ex. 22 at 594) and that the only way to determine how many people signed up for a free trial on Plaintiff's website in a given month was to go through the sign-up emails generated during that time frame (id. at 597-98). Moreover, in its January 15 Order, the undersigned treated these two issues separately, first ordering Plaintiff to produce the Quickbooks data in response to Defendant's motion to enforce the Court's December 2 Order (see Jan. 15, 2015 Order at 1 (granting

although the expert stated that he obtained the numbers regarding free trials from a PowerPoint presentation Cecil used to recruit investors (Peterson Conf. Decl., Ex. 14 at 12 n.47 (citing document with Bates stamp 0005811); Peterson Conf. Reply Decl., Ex. 22 at 620-23 (Cecil testimony regarding document with Bates stamp 5811)), and from his own "discussions with Oculu management" (Peterson Conf. Decl., Ex. 14 at 12 n.48), the original source could only have been the sign-up emails.

"Defendant's motion to enforce the Court's December 2, 2014 Order, as follows: No later than seven days from the date of the hearing, Plaintiff must produce its Quickbooks data files to Defendant's counsel")) and then granting Defendant's second motion to compel and ordering Plaintiff to produce "all documents" responsive to RFP numbers 131, 132, 135, and 136 within seven days (id. at 2). Plaintiff's argument that he believed the Quickbooks data would fully satisfy those RFPs is not persuasive.

Plaintiff further contends that in any event, it has now produced the Excel file, MySQL database, and sign-up emails and its "early omission is not contemptible conduct." (Opp'n Mot. Contempt at 8.) But that Plaintiff apparently eventually produced the requested data does not preclude the imposition of sanctions. See Combs, 285 F.3d at 906 ("Last-minute tender of documents does not cure the prejudice to opponents nor does it restore to other litigants on a crowded docket the opportunity to use the courts.").

Plaintiff also argues that the Excel file was maintained on a "decommissioned computer" and it was unaware it existed until Ardell's deposition (Opp'n Mot. Contempt at 8), but given that Plaintiff is by its own description a "small" organization (Tailleau Decl. ¶ 31) and the Excel file was created by its vice president, it is not persuasive that the spreadsheet would not have been discovered during a diligent search and reasonable inquiry for responsive documents. Moreover, Ardell testified that the spreadsheet mainly listed information from the sign-up emails he received (Peterson Conf. Decl., Ex. 11 at 98-101), and

12

he further testified that he assisted in responding to discovery requests in this case by providing "every single email" he had to Cecil in the form of a zip drive (see id. at 29-30, 32). Indeed, Cecil apparently received or at least had access to those same emails. (See Peterson Conf. Reply Decl., Ex. 22 at 597-98.) That Plaintiff failed to produce that information, either in the form of the Excel spreadsheet or the sign-up emails, tends to show that its search for responsive documents was not diligent.

In sum, Plaintiff should be found to have violated its discovery obligations and the January 15 Order by failing to timely produce the Excel spreadsheet, MySQL database, and sign-up emails.

### 2. *Email Regarding "Confusion"*

Defendant points out that Plaintiff's chief technology officer, Winters, testified that an attorney for one of Plaintiff's clients "sent an email to Mr. Cecil and Mr. Winters, in which the attorney supposedly commented about confusion over VR goggles," which is one of Defendant's main products. (Mem. Contempt Mot. at 5; Peterson Conf. Decl., Ex. 13 at 114-15, 118-19 (Winters testimony).) Defendant contends that Plaintiff "previously responded that it had produced all documents responsive to RFP Nos. 93-98 (emails and documents relating to alleged confusion), which were subject to the Court's December 2 Order granting Defendant's Motion to Compel," and that the document still has not been produced. (Mem. Contempt Mot. at 5 (citations omitted); see also Nov. 11, 2014 Mot. Compel at 16-17.)

Defendant is correct that Winters testified that a

13

representative of a customer — apparently Canon — emailed Cecil and Winters in the first half of 2014, wanting more information "on why we were releasing virtual reality goggles." (Peterson Conf. Decl., Ex. 13 at 118-19.) He testified that the confusion "delayed our approval and sort of jeopardized us getting our first project with" that customer. (Id. at 115.) Winters spoke with Cecil about the email and Cecil responded to it; Winters was not copied on any reply email and did not know whether Cecil responded by phone or email. (Id. at 120.)

Plaintiff acknowledges that the Winters email would have been "relevant" and responsive to the cited RFPs but asserts that it conducted a thorough search and review and "to the extent that it ever had that email, [it] was not found and as such it was not turned over."[5]  (Opp'n Mot. Contempt at 5; Taillieu Decl. ¶ 19.)[6]

---

[5]In a response to an interrogatory asking Plaintiff to "[d]escribe in detail all oral or written communications from any customer or potential customer of [P]laintiff in which the customer mentioned Defendant or Defendant's trademark," Plaintiff stated that

> . . . Mr. Cecil was negotiating a contract with Canon, which was his single largest client.  Canon was utterly confused as to why Canon was spending money for virtual reality.  The reason for the confusion was that the lawyer in charge of negotiating the contract had been on [Defendant's] website and was asking Mr. Cecil about goggles.

(Taillieu Decl., Ex. 7 at 3-4.)  Plaintiff did not identify any emails from Canon regarding that incident, however.  (Id.) Winters, moreover, testified that he didn't "recall having any phone conversation" with a Canon representative about the issue and remembered only the email. (Peterson Conf. Decl., Ex. 13 at 118.)

[6]In his declaration, Plaintiff's counsel states that he has attached to his declaration as Exhibit 6 "the final supplemental

14

It argues that "[n]ot turning over a document that one does not have is not a violation of a court order." (Opp'n Mot. Contempt at 5-6.)  But as Defendant contends (Reply at 11), Plaintiff had a duty to preserve that email, as it was received either after or shortly before this lawsuit was filed, in February 2014.[7] Indeed, Plaintiff sent Defendant a letter on January 6, 2014, demanding that it stop using the Oculus trademark and stating that if the matter was not resolved, it would "seek relief . . . through the Court." (See Peterson Decl., Ex. 16.)  As such, its duty to preserve evidence had attached at least as early as that date.  See In re Napster, Inc. Copyright Litig., 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006) ("As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action."). As Defendant also notes, Plaintiff has not submitted a declaration from Cecil or any other evidence to show that Winters was simply mistaken about the email's existence. (See Reply at

responses to the RFPD No. 93-98" and that "[i]n it, Plaintiff states that it has produced everything in its possession, which it has." (Taillieu Decl. ¶ 19.)  Exhibit 6 is an excerpt from Cecil's deposition (and a duplicate of Exhibit 5), however, not a discovery response.  (See Taillieu Decl., Exs. 5, 6.)  But in any event, Defendant acknowledges that Plaintiff has averred that it has conducted a diligent search and produced everything in its possession responsive to those RFPs.  (Mem. Contempt Mot. at 5.)

    [7]Winters testified that this incident occurred in the first half of 2014 (Peterson Conf. Decl., Ex. 13 at 118-19), and some evidence shows that the incident occurred around April 2014: Defendant submitted an email that Cecil apparently drafted on April 2, 2014 (but did not send), stating that he had been "[o]n a call" with a Canon representative and lawyer and that the lawyer had "ended up on the wrong [web]site" and "asked if we made googles [sic]" (Peterson Reply Decl., Ex. 19).

11.) As such, Plaintiff has either violated the December 2 Order by failing to produce the Winters email or it has deleted it in violation of its duty to preserve relevant evidence.

### 3. *PowerPoint Presentation*

Rachel Hodges testified at her deposition that during her internship with Plaintiff in the summer of 2008, she created a PowerPoint presentation that "outlined all of the reasons behind why [the brand name Oculu] would make sense" and then presented it to Cecil, Plaintiff's president.[8] (Mem. Contempt Mot. at 5; Peterson Decl., Ex. 2 at 46-47 (Hodges's testimony).) Defendant contends that this document is responsive to RFP No. 74 (Mem. Contempt Mot. at 5), which requested "[d]ocuments concerning [P]laintiff's selection of the 'Oculu' mark" (see Nov. 11, 2014 Peterson Decl. Supp. Def.'s Mot. Compel, Ex. A at 58), and was the subject of the Court's December 2 Order (Mem. Contempt Mot. at 5). In that Order, the Court granted Defendant's motion to compel responses to 63 RFPs, including RFP number 74, and it specifically ordered that "if as to a particular RFP Plaintiff has performed a diligent search and reasonable inquiry and has concluded that it does not have any responsive documents in its possession, custody, or control, it must so state in a supplemental written response." (Dec. 2, 2014 Order at 3.)

Plaintiff contends that it did not violate the Court's

---

[8]Although Hodges testified that her internship was in the summer of 2008 (Taillieu Decl., Ex. 16 at 24), Plaintiff contends it was in 2009 (Opp'n Mot. Contempt at 11) and submitted a portion of Cecil's deposition testimony in which he stated that he thought her internship was in 2009 (Taillieu Decl., Ex. 5). Whether the internship took place in 2008 or 2009, however, is not relevant to the resolution of this motion.

16

December 2 Order because Hodges's PowerPoint presentation is not
in its custody, possession, or control. (Opp'n Mot. Contempt at
4-5.) In support, Plaintiff notes that in her deposition, Hodges
"refused to say categorically" that "such presentation was on
Plaintiff's computers." (Id. at 4.) But although Hodges's
testimony on this point was somewhat equivocal, she eventually
indicated that she had probably worked on a company desktop.
(Peterson Decl., Ex. 2 at 48 (Hodges testifying, "I don't
remember if I had my own computer or if . . . [Cecil] gave me
one," but then stating, "I think he gave me one" and "I think I
was working on a desktop").) Thus, the fact that Hodges was
unsure of whether she used a company computer or her own fails to
conclusively establish that the PowerPoint presentation was not
in Plaintiff's control.

Plaintiff also contends that Cecil testified that Hodges had
worked on her own laptop during her internship, and that a search
of Plaintiff's computer system failed to uncover the PowerPoint
file. (Opp'n Mot. Contempt at 5.) But the portion of the
deposition transcript Plaintiff cites to support those assertions
does not show any such testimony. (See Taillieu Decl., Ex. 5.)
Rather, regarding the PowerPoint, Cecil testified only that he
remembered that Hodges had presented a list of names to him but
didn't remember any PowerPoint presentation. (Id.) Plaintiff's
argument therefore fails.

Thus, Plaintiff has produced no persuasive evidence showing
that it has complied with the Court's December 2 Order requiring
that Plaintiff respond to RFP number 74 or aver that a diligent
search was conducted and no responsive document was found. As

such, Plaintiff is in violation of the Court's December 2 Order.[9]

III. <u>Some Sanctions Are Warranted</u>

Defendant asks the Court to sanction Plaintiff by precluding it from "offering any argument, evidence, or testimony" relating to "alleged 'confusion' from an attorney of a client," "its free trial customers" and "paid subscriptions, or its conversion of free trial customers to paid customers," and "its actual damages theory (namely that Defendant's conduct allegedly caused a reduction in free trials and paid conversions), including but not limited to its expert['s] . . . theory on 'Actual Damage.'" (Mem. Contempt Mot. at 23-24.) Defendant also asks the Court to preclude Plaintiff from offering testimony, including expert testimony, "relating to the creation of the 'Oculu' name." (<u>Id.</u> at 13.)

Defendant's requested sanction is too harsh. An order precluding any argument, evidence, or testimony regarding those issues would have the effect of collapsing Plaintiff's case, which is a severe penalty and is not warranted here. <u>Cf.</u> <u>United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.</u>, 857 F.2d 600, 603 & n.5 (9th Cir. 1988) (dismissal, default judgment, and sanction orders taking party's allegations as established and

---

[9]Defendant submitted as an exhibit Plaintiff's supplemental responses to Defendant's various discovery requests, but it appears that the page or pages containing Plaintiff's supplemental response to RFP number 74 were omitted. (<u>See</u> Peterson Decl., Ex. 1 (Plaintiff's third supplemental responses to first set of RFPs, which includes page 23, showing RFP number 72, and then skips to page 27, showing response to RFP number 83).) Plaintiff has not argued or submitted evidence showing that it averred that it conducted a diligent search of its records but that the PowerPoint file could not be located.

awarding judgment on that basis are "the most severe penalty" and authorized only in "extreme circumstances"). Plaintiff has now produced much of the evidence at issue, including the Excel spreadsheet, information from the MySQL database, and sign-up emails (see Peterson Conf. Reply Decl., Ex. 22 at 592, 597 (Cecil's testimony that information from MySQL database and sign-up emails were provided to Defendant); Taillieu Decl. ¶ 24, Ex. 11 (Excel spreadsheet)), and nothing shows that Plaintiff's delay in producing the evidence "impair[ed] [Defendant's] ability to go to trial or threaten[ed] to interfere with the rightful decision of the case," see Fay Ave. Props., LLC v. Travelers Prop. Cas. Co. of Am., No. 3:11-cv-02389-GPC-WVG, 2013 WL 3746107, at *9-10 (S.D. Cal. July 15, 2013) (finding terminating sanctions unwarranted when plaintiff remedied deficiencies in discovery and defendant failed to show prejudice). As such, the Court should decline to issue an order precluding Plaintiff from introducing any argument, evidence, or testimony regarding customer confusion, the creation of its name, and conversion or retention of customers.

In the alternative, Defendant asks the Court to find that it is "entitled to an adverse inference that the free trial and conversion documents and data that Plaintiff did not timely produce would not support, and would in fact contradict, the conclusions and estimates proffered by Plaintiff and its damages expert." (Mem. Contempt Mot. at 24 (emphasis in original).) Courts have held under Rule 37(b) that "evidentiary preclusion is a harsh sanction that generally is not imposed where the failure to provide discovery was either substantially justified or

19

harmless." <u>FormFactor, Inc v. Micro-Probe, Inc.</u>, No. C-10-03095
PJH (JCS), 2012 WL 1575093, at *2 (N.D. Cal. May 3, 2012)
(alteration and internal quotation marks omitted); <u>see also</u> Fed.
R. Civ. P. 37(c)(1) (evidentiary sanctions not warranted if
failure to provide information under Rule 26(a) "was
substantially justified or is harmless").

Evidentiary sanctions are not warranted based on Plaintiff's
failure to timely produce the MySQL database, Excel spreadsheet,
and sign-up emails. Defendant contends that it was prejudiced by
Plaintiff's late disclosure of those documents because it was
"not possible for Defendant to review the documents in any
meaningful way" before Cecil's deposition "in order to question
[him] about them." (Mem. Contempt Mot. at 7.) Defendant further
contends that it was unable to conduct follow-up discovery
regarding those documents because discovery closed the week
before they were produced. (<u>Id.</u> at 7-8.) But as Plaintiff
points out (Opp'n Mot. Contempt at 3, 9), Judge Carter's
scheduling order specifically stated that "[a] deposition which
commences five (5) days prior to the discovery cut-off may
continue beyond the cut-off date, as necessary" (July 21, 2014
Scheduling Order at 2). Moreover, on March 2, 2015, the day
after Plaintiff produced the documents, Plaintiff's counsel
stated at Cecil's second deposition,

> we understand that these documents might require the
> further questioning of some of the witnesses that have
> been already produced, including Mr. Cecil. To the
> extent that it is necessary, . . . we are willing to make
> those witnesses available again . . . .

20

(Peterson Conf. Reply Decl., Ex. 22 at 525; <u>see also</u> Taillieu Decl. ¶ 26.)  Defendant, however, never availed itself of that opportunity, which complied with Judge Carter's scheduling order and likely would have cured any prejudice from Plaintiff's late disclosure.[10]

Plaintiff's failure to earlier produce information from the MySQL database appears to have been harmless for two additional reasons.  First, the database likely does not reflect an accurate number of free-trial signups.  Plaintiff's chief technology officer, Winters, testified that he was unsure whether the MySQL database would "track a conversion from free to paid versus someone that may sign up as paid initially" and that "it's just the same record in the database, and it just rolls from trial to paid and then a dollar amount attached with the billing cycle." (Peterson Conf. Decl., Ex. 13 at 53.)  Cecil similarly testified that the database "will keep track of that customer, but it doesn't say this guy was in a free trial and now he's a paying customer."  (<u>See</u> Peterson Conf. Reply Decl., Ex. 22 at 593.) Second, although the MySQL database showed all of Plaintiff's current customers (<u>see</u> Peterson Conf. Decl., Ex. 13 at 53), Plaintiff had already produced its Quickbooks data showing that

---

[10]Defendant contends that the Excel document Plaintiff produced "does not align with the document that Mr. Ardell described" because it does not have "a different tab for each month," as Ardell stated. (Reply at 6; Peterson Reply Decl. at ¶ 3.)  But the Excel document simply lists information from the sign-up emails, which Plaintiff says it has now produced.  In any event, had Defendant availed itself of the opportunity to conduct further depositions, it could have questioned Plaintiff's witnesses regarding the Excel document and determined whether it was the document Ardell had described.

same information.

But evidentiary sanctions are warranted based on Plaintiff's failure to produce the Hodges PowerPoint presentation. Plaintiff failed to submit any evidence showing that it responded to RFP number 74 or averred that a diligent search was conducted and no responsive document was found, as required under the December 2 Order. Moreover, Defendant reasonably contends that it was prejudiced by Plaintiff's failure to produce the PowerPoint, stating that given Hodges's "testimony that she thought 'Oculu' was 'original' and 'different enough from Oculus,' her PowerPoint presentation to Mr. Cecil likely contained information harmful to Plaintiff as to why it chose 'Oculu' over 'oculus.'" (Reply at 13 (citation omitted).) Because nothing shows that Plaintiff's failure to produce the PowerPoint presentation was substantially justified or harmless, Defendant should be permitted to submit a proposed jury instruction informing the jury of that failure and instructing that it may draw an appropriate adverse inference on that basis.

Sanctions are also warranted based on Plaintiff's failure to produce the Winters email in response to Defendant's RFPs and the December 2 Order, or alternatively, its failure to preserve that email in anticipation of this litigation. See Fed. R. Civ. P. 37(b)(2)(A)(ii); Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993) (as amended) (district court has "inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence," including ordering "exclusion of certain evidence"). Winters unequivocally testified that a Canon representative sent an email to Cecil,

22

Plaintiff's president, and Winters concerning confusion about Defendant's website and goggles, that he and Cecil discussed the email, and that Cecil responded to it, either by phone or email. Plaintiff has not provided any evidence, in the form of Cecil's declaration or otherwise, that the email never existed. The email sent to Cecil and Winters is relevant to prove or disprove Plaintiff's claims that Defendant's adoption of the name Oculus created confusion "within the industry and among consumers, customers, and potential customers." (First Am. Compl. at 1.) Moreover, Plaintiff has failed to show that its failure to produce the email was substantially justified or harmless. As such, Defendant should be permitted to submit a proposed jury instruction informing the jury that Plaintiff failed to produce the Winters email and that it is entitled to draw an appropriate adverse inference on that basis.

Defendant has also requested its attorney's fees and costs in bringing this motion. Rule 37 and the advisory committee notes to it contemplate that an award of fees to the prevailing party in a discovery dispute should be the norm. The advisory committee notes explain that the language of the rule was changed to reflect that sanctions must be imposed in certain circumstances in order to stem "abuses occurring in the discovery process." Fed. R. Civ. P. 37 advisory committee's note to 1970 amend. "[E]xpenses should ordinarily be awarded"; they should not be given only when a party "acted justifiably in carrying his point to court." Id. Thus, Defendant should be permitted to submit an itemization of its costs, including attorney's fees, in preparing and filing the portions of its motion pertaining to

Plaintiff's failure to produce the Winters email, Excel spreadsheet, MySQL database, sign-up emails, and PowerPoint presentation, and Defendant should be awarded that amount unless Plaintiff can persuasively argue that all or part of it is not justified.

IV.  Spoliation of Evidence

Defendant contends that Plaintiff "may have engaged in spoliation of evidence" because it "appears to have destroyed documents relating to free trial signups and conversions" within its MySQL database.  (Mem. Contempt Mot. at 14.)  Defendant points to Winters's testimony, which shows that Plaintiff "frequently purge[d] inactive customers" from the database "just because it's a storage resource issue."  (Peterson Conf. Decl., Ex. 13 at 55.)

Plaintiff contends that its deletion of data from its database "is of no moment to the issue of how many free trials were ever commenced on [its] site" because the database does not show whether a paid subscription started as a free trial.  (Opp'n Mot. Contempt at 12; Peterson Conf. Decl., Ex. 13 at 53.)  Thus, Plaintiff argues, "no amount of data storage, purged or otherwise, would allow Defendant to determine how many free trials rolled over to paid subscriptions."  (Opp'n Mot. Contempt at 12-13.)

A.  Applicable law

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)

24

(internal quotation marks omitted); accord Reinsdorf v. Skechers
U.S.A., Inc., 296 F.R.D. 604, 625 (C.D. Cal. 2013).  Once the
duty to preserve evidence attaches, a litigant or potential
litigant is "required to suspend any existing policies related to
deleting or destroying files and preserve all relevant documents
related to the litigation." Napster, 462 F. Supp. 2d at 1070.
The district court has the inherent authority to impose sanctions
based on the spoliation of relevant evidence, including
evidentiary sanctions and adverse-inference instructions.  Med.
Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc., 306 F.3d 806,
824 (9th Cir. 2002); Glover, 6 F.3d at 1329.

    B.   Discussion

    Although Plaintiff does not dispute that it deleted
information from its database during this litigation, including
information about expired free-trial accounts (see Peterson Conf.
Reply Decl., Ex. 22 at 597 (Cecil's testimony that Plaintiff
deleted data relating to free-trial signups "two weeks ago")),
sanctions are nevertheless unwarranted, see Reinsdorf, 296 F.R.D.
at 626 ("The bare fact that evidence has been altered or
destroyed does not necessarily mean that the party has engaged in
sanction-worthy spoliation." (internal quotation marks omitted)).
As an initial matter, nothing indicates that Plaintiff destroyed
relevant evidence with the intent of keeping it from Defendant,
as opposed to simply purging data to maintain space on its
server.  (See Peterson Conf. Decl., Ex. 13 at 55 (Winters's
testimony that Plaintiff "frequently purge[s] inactive customers
just because it's a storage resource issue"); Peterson Conf.
Reply Decl., Ex. 22 at 596 (Cecil's testimony that retaining data

25

from free trials "would be a huge cost expense")); <u>see</u> <u>Napster</u>,
462 F. Supp. 2d at 1066-67 ("a party's motive or degree of fault
in destroying evidence is relevant to what sanction, if any, is
imposed").

Moreover, Defendant has failed to show that it was
prejudiced by Plaintiff's actions. <u>See</u> <u>Reinsdorf</u>, 296 F.R.D. at
627 ("'for the court to issue sanctions, the absence of the
evidence must be prejudicial to the party alleging spoliation of
evidence'" (quoting <u>Victor Stanley, Inc. v. Creative Pipe, Inc.</u>,
269 F.R.D. 497, 531 (D. Md. 2010))). Even if no data had been
purged from the database, it likely would not reflect an accurate
number of free-trial signups because, as discussed in Section
III, Winters and Cecil both testified that the database does not
show whether its paying customers had initially signed up for a
free trial. (Peterson Conf. Decl., Ex. 13 at 53; Peterson Conf.
Reply Decl., Ex. 22 at 593.) And Plaintiff has already produced
its Quickbooks data, which show all of its customer accounts.
Because Defendant has therefore suffered no material prejudice,
the Court should deny Defendant's request for sanctions based on
the alleged spoliation of evidence.

V.    <u>Waiver of Privilege Based on Failure to Produce Privilege</u>
      <u>Log</u>

Defendant contends that Plaintiff's failure to produce a
privilege log "constitutes a waiver of privilege." (Mem.
Contempt Mot. at 19.) It contends that its counsel requested a
privilege log from Plaintiff "[o]n numerous occasions" (<u>id.</u>) but
that Plaintiff did not produce one; its counsel instead stated
that he "confirm[ed] that there are no privileged communications

that are responsive to any document requests" (Peterson Decl., Ex. 8 (Jan. 16, 2015 email from Plaintiff's counsel)). Defendant notes that it has submitted discovery requests "relating to Plaintiff's first awareness of Defendant; its communications with third parties about Defendant, its products, or this lawsuit; its prosecution of its trademark application; and its press releases mentioning Plaintiff" and that "[i]t is not credible that Plaintiff's only communications regarding [those subjects] were with non-attorneys." (Mem. Contempt Mot. at 19.) Defendant asks the Court to find that Plaintiff "waived any and all privilege" and order Plaintiff to produce "its written communications with former or current counsel relating to its trademark application, its decision whether to enforce its alleged trademark rights, its demand letter to Defendant, the allegations in its Complaints in this case, and its press releases relating to this litigation." (Id. at 24.)

In its Opposition, Plaintiff contends that it produced a privilege log in response to the instant motion — apparently on the same day it filed its Opposition — and that Defendant therefore "suffered no prejudice." (Opp'n Mot. Contempt at 13; Taillieu Decl., Ex. 20 (privilege log dated Mar. 9, 2015).) Plaintiff argues that "the only privilege documents withheld were communications between lawyers and clients related to (1) trademark prosecution and (2) instant litigation." (Opp'n Mot. Contempt at 14; see also Taillieu Decl., Ex. 20.) In reply, Defendant contends that it suffered prejudice from the late production of the privilege log because it was "produced after the close of discovery, when there is no opportunity to ask

witnesses about any of the entries or learn the identity of any
unknown individuals on the log." (Reply at 23.) Defendant
further argues that the log is "flawed" because it does not list
certain communications, such as those with attorneys at the time
the Oculu trademark was filed, and because one of the three
entries lists a date range of "12/8/2013 - 5/8/2013" and is
therefore "nonsensical." (Id.; Taillieu Decl., Ex. 20.)

Under Federal Rule of Civil Procedure 34(b)(2)(A), "the
party to whom [a production request] is directed must respond in
writing within 30 days after being served." Rule 26(b)(5)(A)
provides that, when claiming privilege, a party must

> (i) expressly make the claim; and (ii) describe the
> nature of the documents, communications, or tangible
> things not produced or disclosed--and do so in a manner
> that, without revealing information itself privileged or
> protected, will enable other parties to assess the claim.

In analyzing how Rule 34 and Rule 26(b)(5) interact, the
Ninth Circuit in Burlington Northern & Santa Fe Railway Co. v.
U.S. District Court for the District of Montana, 408 F.3d 1142,
1149 (9th Cir. 2005) (as amended), held that "boilerplate
objections or blanket refusals inserted into a response to a Rule
34 request for production of documents are insufficient to assert
a privilege." But the Ninth Circuit rejected a "per se waiver
rule that deems a privilege waived if a privilege log is not
produced within Rule 34's 30-day time limit." Id. Instead, the
Ninth Circuit instructed district courts to use the 30-day period
of Rule 34 as a default guideline and "make a case-by-case
determination" under the following factors:

28

[(1)] the degree to which the objection or assertion of
privilege enables the litigant seeking discovery and the
court to evaluate whether each of the withheld documents
is privileged (where providing particulars typically
contained in a privilege log is presumptively sufficient
and boilerplate objections are presumptively
insufficient); [(2)] the timeliness of the objection and
accompanying information about the withheld documents
(where service within 30 days, as a default guideline, is
sufficient); [(3)] the magnitude of the document
production; and [(4)] other particular circumstances of
the litigation that make responding to discovery
unusually easy (such as . . . the fact that many of the
same documents were the subject of discovery in an
earlier action) or unusually hard.

Id.

    Although a close call, here the Burlington factors together
do not weigh in favor of finding waiver.[11]  The first factor —
the degree to which the assertion of privilege enables the
litigant to evaluate whether each of the withheld documents is
privileged — is neutral.  Plaintiff's three privilege-log entries
could certainly be more detailed: two state only that they are
"[e]mails regarding prosecution of lawsuit" from "various" at

---

    [11]Defendant failed to address the Burlington factors, which
also weighs against a finding that Plaintiff waived its privilege
objection.  See Best Buy Stores, L.P. v. Manteca Lifestyle Ctr.,
LLC, No. 2:10-cv-0389-WBS-KJN, 2011 WL 2433655, at *6 (E.D. Cal.
June 14, 2011).

counsel's office to "various" at Plaintiff, without listing any

names or other identifying information (Taillieu Decl., Ex. 20),

and one of those two entries lists an invalid date range (id.

(listing dates of emails as "12/8/2013 - 5/8/2013")).

Nevertheless, it is clear that Plaintiff's assertion of privilege

is limited to emails with its counsel regarding Plaintiff's

trademark application and this lawsuit.  Indeed, as Plaintiff

points out (Opp'n Mot. Contempt at 13-14), many of Defendant's

descriptions in its own privilege log are similarly brief (see

Taillieu Decl., Ex. 21).  As such, this factor is essentially

neutral.  See Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc.,

Nos. 2:05-cv-01532-RLH-GWF, 2:06-cv-00101-RLH-GWF, 2007 WL

631950, at *5 (D. Nev. Feb. 26, 2007) (finding no waiver when log

attached to party's opposition to motion to compel identified

"email messages between [party] and its counsel" even though it

did "not provide information as to the dates of the various email

communications or the recipients of the communications"); Carl

Zeiss Vision Int'l Gmbh v. Signet Armorlite Inc., Civil No. 07-

cv-0894-DMS (POR), 2009 WL 4642388, at *4 (S.D. Cal. Dec. 1,

2009) (finding that log listing "legal advice of counsel" for

certain patents, although devoid of "particulars," was

"sufficient to render the first [Burlington] factor neutral").

    The second Burlington factor, however, weighs in favor of

waiver.  Plaintiff apparently did not produce its privilege log

in response to any of Defendant's discovery requests, instead

waiting until March 9, 2015, almost two weeks after discovery

closed.  During discovery, by contrast, Plaintiff's counsel

informed Defendant that he had "confirm[ed] that there are no

privileged communications that are responsive to any document requests." (Peterson Decl., Ex. 8 (Jan. 16, 2015 email from Plaintiff's counsel).) Contrary to Plaintiff's claims, its late disclosure of the privilege log prejudices Defendant because it is now precluded from testing the assertion of privilege through discovery. See Bullion Monarch Mining, Inc. v. Newmont USA Ltd., 271 F.R.D. 643, 649 (D. Nev. 2010) (second Burlington factor weighed in favor of waiver when privilege log was produced seven months after close of discovery).

The third Burlington factor, the magnitude of document production, weighs somewhat against waiver of Plaintiff's attorney-client privilege. Plaintiff contends that it has produced over 10,000 pages of data "as well as countless other files made available to the Defendant online." (Taillieu Decl. ¶ 5.) Further, according to Plaintiff's privilege log, it seeks to withhold only emails between counsel and Plaintiff. (Id., Ex. 20); McKeen-Chaplin v. Provident Sav. Bank, FSB, No. 2:12-cv-03035 GEB AC, 2015 WL 502697, at *11 (E.D. Cal. Feb. 5, 2015) (finding that third Burlington factor weighed against waiver when party had produced 12,000 pages of documents and sought to withhold only three).

The fourth factor, the particular circumstances of the litigation that make responding to discovery unusually easy or unusually hard, is also neutral. Plaintiff argues that it is difficult to locate responsive documents because it is a "small organization" without "any centralized computer system." (Taillieu Decl. ¶¶ 31-33.) As a result, Plaintiff argues, it must "often rely[] on other individual's [sic] memory as to where

31

certain documents are," and employees are more likely to work on
their own computers without saving documents to the company's
current system. (Id. ¶¶ 32-33.) But as Defendant argues (Reply
at 1), Plaintiff's small size should also make it easier for it
to locate documents responsive to Defendants' discovery requests.
Indeed, Plaintiff's office is apparently physically quite small,
and only a few people work there. (See Peterson Conf. Reply
Decl., Ex. 23 at 58-59 (Cecil testifying that Plaintiff had few
shareholders, three employees, and two independent contractors),
78-79 (Cecil describing size of office).) Thus, this factor
weighs neither for nor against waiver.

     On balance, therefore, the Burlington factors appear to be
in equipoise. But given that most of the documents listed on the
log appear to discuss this litigation and thus their production
would be particularly prejudicial to Plaintiff, a finding of
waiver is not warranted. See Vieste, LLC v. Hill Redwood Dev.,
No. C-09-04024 JSW (DMR), 2010 WL 4807058, at *9 (N.D. Cal. Nov.
18, 2010) (finding that "it would be well within this Court's
discretion to order a waiver of all documents that appear for the
first time on [d]efendants['] [new] privilege log" but providing
additional opportunity for defendant to argue why waiver should
not apply "in light of the fact that some of the documents appear
to discuss this litigation, and thus their production may be
particularly prejudicial to [d]efendants' position"); see also
Burlington N., 408 F.3d at 1149 (noting that "factors should be
applied in the context of a holistic reasonableness analysis").
Defendant's request should therefore be denied, or Plaintiff
should be ordered to produce a more detailed log, listing for

32

each document "(a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated." <u>In re Grand Jury Investigation</u>, 974 F.2d 1068, 1071 (9th Cir. 1992). The Court can then make a case-by-case determination concerning production.

**RECOMMENDATION**

IT ACCORDINGLY IS RECOMMENDED that the District Judge issue an order (1) accepting this Report and Recommendation, (2) granting in part Defendant's motion for evidentiary sanctions, and (3) granting Defendant's request for attorney's fees in an amount equal to its costs and fees in preparing, serving, and filing the portions of its March 2, 2015 motion and reply pertaining to Plaintiff's failure to produce the Winters email, Excel spreadsheet, MySQL database, sign-up emails, and Hodges PowerPoint presentation.

DATED: May 8, 2015

JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

33