O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| OCULU, LLC,<br><br>               **Plaintiff / Counter-Defendant,**<br><br>     vs.<br><br>OCULUS VR, INC.,<br><br>               **Defendant / Counterclaimant.** | Case No.: SACV 14-0196 DOC(JPRx)<br><br>**ORDER**<br><br>**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [95]**<br><br>**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF DAVID DREWS [94]** |

Before the Court are two Motions by Defendant Oculus VR, LLC:[1] a Motion for Summary Judgment ("MSJ") (Dkt. 95) and a Motion in Limine to Exclude Testimony of David Drews ("MIL") (Dkt. 94). For the reasons below, the Court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment and GRANTS IN PART and DENIES IN PART the Motion in Limine.

**I.  Background**

This case arises from allegations by Plaintiff Oculu, LLC that Defendant is infringing on Plaintiff's trademark by using a mark that is confusingly similar to Plaintiff's mark, and that, as

---

[1] The lawsuit names Oculus VR, Inc. as the defendant. Oculus VR, LLC is Oculus VR, Inc.'s successor by merger. *See* Declaration of Marcus D. Peterson in Support of Mot. in Limine, Ex. 4 (Dkt. 94-6).

a result of that infringement, Plaintiff has seen its relevance on the web decrease and lost customers it otherwise would have had while Defendant has been unjustly enriched through its $2 billion acquisition by Facebook.

### A. Facts

#### 1. Plaintiff Oculu's Business

Plaintiff Oculu began as part of Innovate Media Group ("Innovate Media"), a video production company majority-owned by John Cecil, who has previously worked in television and at Yahoo. Innovate Media shoots and edits videos for other companies. Def.'s Statement of Undisputed Facts ("DUF") (Dkt. 95-12) Nos. 43-44.[2]  Starting in 2010, Innovate Media began performing video hosting and related services, or "video delivery" services. In summer 2008 or 2009, Mr. Cecil asked Innovate Media's intern Rachel Hodges to come up with a name for Innovate Media's intended video delivery services. DUF No. 46. Ms. Hodges initially considered the name "Oculus" because she was familiar with the word. However, when she checked, the domain name www.oculus.com had already been registered and another company owned a trademark registration for "Oculus." DUF Nos. 48-49. She then suggested removing the "s" to make "Oculu," which was "original" and "different enough from Oculus." DUF No. 50. Mr. Cecil agreed with her suggestion and chose "Oculu" as the name. DUF No. 51.

In November 2010, Mr. Cecil filed a trademark application for OCULU in his own name, covering "streaming audio and video by means of the Internet." DUF No. 52. Innovate Media spun off Oculu into a standalone company in January 2013, with Mr. Cecil as the majority shareholder and chief executive officer ("CEO") of Oculu. DUF No. 86. As part of the spin-off, Innovate Media transferred its customer list and the OCULU trademark to Oculu. When it was spun off, Oculu inherited approximately 180 paying customers from Innovate Media. DUF Nos. 88-89.

---

[2] For ease of reference, the Court will cite to Defendant's Statement of Undisputed Facts for facts that were not disputed by Plaintiff and for facts where the Court has determined there is no genuine dispute.

Today, Oculu is an online video delivery business that helps other businesses display videos on their websites. Oculu's customers upload videos through tools available on Oculu's website, www.oculu.com. The customers then take HTML code generated by Oculu and place it on their own websites so that visitors to their websites can view the videos. DUF Nos. 53, 55-56. Oculu does not host the videos on its own servers; it relies on third-party companies such as Edgecast and Rackspace to host and deliver Oculu's customers' videos. DUF Nos. 61-62. In addition to video delivery, Oculu offers its paying customers an option for "pre-roll advertising," which allows Oculu's customers to monetize their websites by running advertisements at the beginning of the videos. Pre-roll advertising services are the largest source of Oculu's revenue. DUF Nos. 64-65.

Plaintiff does not sell any tangible products under the "Oculu" name. DUF No. 66. Plaintiff does not sell any virtual reality goods or services, such as virtual reality goggles or headsets. Plaintiff does not offer applications for download. Nor does Plaintiff host third-party videos on its website or host video game demonstrations on its website. DUF Nos. 72-76.

The only website from which a customer can order Oculu's services is www.oculu.com. DUF No. 54. Prospective customers can sign up for a 15-day free trial. DUF No. 68. After a free trial, a customer can sign up for one of Oculu's subscription plans and be charged a monthly fee to continue using Oculu's services. The service costs up to $245 per month, depending on the number of video plays and the amount of storage space needed for the video. DUF Nos. 67-69, 71.

Plaintiff invested approximately $55,000 to market and promote its business between 2012 and 2014. DUF No. 92. Plaintiff directly targets business customers primarily in IT, marketing, and sales. The customer's IT personnel often interface with Plaintiff to ensure functionality and security of Plaintiff's system prior to purchasing a subscription. DUF No. 60.

## 2. Defendant Oculus's Origins

In 2012, a developer named Palmer Luckey introduced a virtual reality ("VR") headset for 3D video gaming to the public. Mr. Luckey constructed his first head mounted display ("HMD") for VR video games in his parents' garage in 2009. DUF No. 2. Mr. Luckey's HMD

offered a wide field-of-view, creating the perception of depth and the immersive feeling of being "in" a place, an experience that had previously only been available on very expensive, complex VR systems. DUF No. 4.

On April 15, 2012, he posted a message on a web forum announcing that he was going to call his organization "Oculus" and the HMD product itself "Rift." DUF No. 5. Mr. Luckey testified at his deposition that he first heard of the word "oculus" in 2011 while working at the University of Southern California ICT Mixed Reality Laboratory, where a lab researcher mentioned that "oculus" was Latin for "eye" or "round window." DUF Nos. 6-7. "Oculus" was the first name that came to his mind in April 2012 when he was naming his company because one uses his product by using one's eye to look through a round window (a lens). DUF No. 9. Mr. Luckey was not aware of Plaintiff when he chose "Oculus" as the name of his VR company. DUF No. 157. He did not learn of Oculu's business or its trademark prior to Oculu's filing of the present lawsuit. DUF No. 162.

Mr. Luckey began taking orders for his Rift HMD in June 2012. DUF No. 10. That same month, he showed the Rift at the Electronic Entertainment Expo ("E3"), a major trade show for the video game industry. The Oculus Rift prototype was nominated for a "Best of E3" award and received press coverage because of the event. DUF Nos. 11, 13.

On August 1, 2012, Oculus launched a fundraising campaign on the crowdfunding website Kickstarter.com, with the goal of raising $250,000 to produce more headsets. The Kickstarter campaign eventually raised $2.4 million in 30 days. DUF Nos. 14-15.

In March 2014, Facebook, Inc. announced that it would purchase Oculus VR for approximately $2 billion in cash and Facebook stock. The merger closed on July 21, 2014. Oculus VR (now Oculus VR, LLC) continues to exist as a separate entity following the transaction. DUF Nos. 37-39.

Since its debut, Defendant has appeared at numerous trade shows, including E3, the Consumer Electronics Show ("CES"), the Game Developer's Conference ("GDC"), the South by Southwest Music, Film, and Interactive Festival ("SXSW"), and Facebook's "f8" conference for software developers. DUF No. 26. Oculus VR also hosted its own virtual reality conference,

Oculus Connect, in September 2014. DUF No. 27. Throughout Defendant's entire history, it has continued to receive press coverage for its virtual reality products, both at these events, and generally. DUF No. 28.

### 3. Defendant Oculus's Products

Oculus VR began taking orders for the "Development Kit" ("DK") version of its headset in September 2012 from its website at www.oculusvr.com. DUF No. 16. In March 2014, Defendant began taking orders for the updated version of the Development Kit called the DK2. It is currently available for purchase only on the www.oculus.com website. The kit includes a headset, lenses, an external camera, and various cables. The headset must be connected to a desktop computer for the user to have the VR experience or use VR programs. DUF Nos. 17, 19. Both the DK1 and DK2 units are intended for game developers, not consumers, to create games and software for use with the VR headset. Defendant has not yet offered a consumer version of the Oculus Rift headset. DUF Nos. 18, 20, 124; *see also* DUF No. 125 (purchasers of DK1 or DK2 must certify that they understand the DK1 and DK2 hardware products are for developers, not consumers, in order to purchase the product).

In December 2014, Samsung began selling a mobile-phone-compatible device called the Gear VR, which incorporates Defendant's VR technology. The Gear VR is marketed as "Powered by Oculus." DUF Nos. 21-22. The Gear VR is available from Samsung, AT&T, or Best Buy, but not through Defendant's website. DUF Nos. 23-24. The GEAR VR headset requires a separate Samsung Galaxy Note 4 smartphone and has a retail cost of approximately $200. The Samsung Galaxy Note 4 smartphone has a retail cost of approximately $700. DUF No. 25.

### 4. Future Expansion and Potential Overlap of Plaintiff's and Defendant's Products and Services

Plaintiff's 30(b)(6) witness and CEO Mr. Cecil admitted at his deposition that Plaintiff does "not have a problem with" Defendant's VR headsets. DUF No. 109. Rather, Plaintiff's two main concerns appear to be that (1) Defendant's use of the mark Oculus has "negatively affected" Plaintiff's search engine optimization, DUF No. 110; and (2) Defendant will become a

head-to-head competitor with Plaintiff in the market of streaming video delivery and advertising, as Defendant develops hardware and software that will eventually allow users to stream video through their VR hardware, Cecil Decl. ¶¶ 20-23.

## B. Procedural History

This lawsuit was filed on February 10, 2014. *See* Compl. (Dkt. 1). Plaintiff's operative complaint, the Second Amended Complaint ("SAC") (Dkt. 19-1), alleges three claims:

    (1) Trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114;

    (2) False designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); and

    (3) Unfair business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200.

*See generally* SAC. Defendant has two counterclaims against Plaintiff:

    (1) Cancellation of trademark registration under the Lanham Act, 15 U.S.C. § 1119; and

    (2) Declaratory judgment of no trademark infringement.

*See generally* Answer to Amended Compl. & Counterclaims (Dkt. 20).

Defendant filed the instant Motions on April 13, 2015 (Dkts. 94, 95), seeking summary judgment on all of Plaintiff's claims and on its own cancellation counterclaim. Plaintiff filed opposition briefs on April 27 (Dkts. 106, 109) and Defendant reply briefs on May 11 (Dkts. 125, 128). Oral argument was held on June 8.

## II. Legal Standard for Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's

case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

### III.    Discussion

To prevail on its trademark infringement claim under the Lanham Act, a plaintiff must show that: (1) it holds a valid, protectable trademark; and (2) the defendant's "imitating mark is similar enough to 'cause confusion, or to cause mistake, or to deceive." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005) (quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004)). Actual injury or damages is not required to find liability. *Safeway Stores, Inc. v. Rudner*, 246 F.2d 826, 829 (9th Cir. 1957).

In the instant Motions, Defendant challenges Plaintiff's ability to meet the elements for liability. Defendant seeks summary judgment on all of Plaintiff's claims and on its own cancellation counterclaim on the grounds that:

(1) the OCULU trademark registration is void;

(2) there is insufficient evidence of likelihood of forward confusion; and

(3) there is insufficient evidence of likelihood of reverse confusion.

Defendant also seeks summary judgment on Plaintiff's monetary recovery theories on the grounds that:

(4) there is insufficient evidence of actual damages; and

(5) there is insufficient evidence that Defendant made profits or acted willfully, as required to support an unjust enrichment damages theory.

The Court will address each argument in turn.

## A. Whether the OCULU Trademark Registration Was Valid

Defendant advances two theories for why the OCULU trademark registration is invalid and therefore should be cancelled. First, Mr. Cecil's application for registration was void ab initio because Mr. Cecil registered it in his own name, not Innovate Media's, and Mr. Cecil did not have a bona fide intent to use the OCULU trademark for his own personal benefit, rather than for Innovate Media's benefit. MSJ at 23-25. Second, Defendant argues that the application was voided by Mr. Cecil's impermissible assignment of his rights in the application to Innovate Media before the OCULU mark was actually used. Reply in Support of MSJ at 25. The Court disagrees on both counts.

## 1. Legal Standard

The first element of a trademark infringement claim "is comprised of two sub-parts: the mark's protectability and the plaintiff's ownership of the mark." *S. California Darts Ass'n v. Zaffina*, 762 F.3d 921, 929 (9th Cir. 2014). With regard to protectability, there are three ways in which a plaintiff can establish that it has a protectable interest: "(1) it has a federally registered trademark in goods or services; (2) its mark is descriptive but has acquired a secondary meaning in the market; or (3) it has a suggestive mark, which is inherently distinctive and protectable." *Applied Info. Sciences Corp. v. eBAY, Inc.*, 511 F.3d 966, 969-70 (9th Cir. 2007). "Federal registration of a mark constitutes prima facie evidence of the validity of the mark" entitling the plaintiff alleging federal trademark infringement a presumption that the mark is protectable. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005). Here, Defendant is attacking the federal registration presumption by arguing that the

original application was either void from the beginning or was voided by Mr. Cecil's subsequent actions. If Defendant is correct and Plaintiff's registration should be cancelled, Plaintiff will have to demonstrate protectability and ownership of the mark in other ways.

### a.  Bona Fide Intent to Use a Mark

The Trademark Act permits a person who is already using a mark in commerce to register the trademark with the U.S. Patent and Trademark Office ("USPTO"). 15 U.S.C. § 1051(a)(1). A person who has not yet used a trademark in commerce, but has a bona fide intention to do so, can also register that mark with the USPTO. *Id.* § 1051(b)(1). Such an application is commonly referred to as an "intent-to-use" application.

Either type of applications can be filed by either a natural person or a corporate entity. *Id.* § 1127 (defining "person" as including natural persons and corporations and other types of organizations). However, because one of the primary purposes of trademark law is to allow consumers to have confidence that goods or services sold under a certain mark are of the quality they expect from the owner of that mark, 1 McCarthy on Trademarks and Unfair Competition § 2:4 (4th ed.), it is important to be precise about exactly who is using or intends to use the mark and who will be guaranteeing the quality of the goods and services sold under it. For instance, "if it is a corporation or partnership which has the bona fide intention to use a particular mark, and yet the intent-to-use application is filed in the name of an individual, then said application will be deemed to be void ab initio." *Am. Forests v. Sanders*, 54 U.S.P.Q.2d (BNA) 1860, 1862 (T.T.A.B. 1999) (finding an intent-to-use application void where the application was filed in the wife's individual capacity, but the husband-and-wife partnership intended to use a mark, with the wife's role in the partnership being limited to creating the mark itself and acting as her husband's general "advisor").[3]

---

[3] *See also Paul Audio, Inc. v. Baoning Zhou*, 2011 WL 6780740, at *14 (T.T.A.B. Dec. 7, 2011) (non-precedential) (cancelling registration of a trademark where an application was void ab initio because it was filed by the majority shareholder of a company in his individual capacity but the mark was actually owned by the company, the only entity that used the mark).

That said, an individual can demonstrate his or her own bona fide intent to use the mark even if the trademark will be partially used or even solely used by a "related company." A "related company" uses the mark when the individual controls the company's use of the mark with respect to the nature and quality of the goods or services with which the mark is used. In such a situation, the related company's use of the mark is deemed to inure to the benefit of the individual. 15 U.S.C. § 1127; TMEP § 1201.03 (5th ed. 2007).

Thus, it is important to know when a company using the mark is a "related company" vis-à-vis the individual. The fact that an individual applicant is a shareholder, director, or officer in a corporation is not sufficient by itself to establish that the corporation is a related company. TMEP § 1201.03(d). The fact that the individual applicant licensed the mark to a corporation, as opposed to assigning away all rights to use the mark to the corporation, can serve as evidence that the individual had bona fide intent to use the mark for his own benefit. However, it is not dispositive. *See* TMEP § 1201.03(d) ("Ownership rights in a trademark or service mark may be acquired and maintained through the use of the mark by a controlled licensee even when the only use of the mark has been made, and is being made, by the licensee."). Similarly, the fact that an individual applicant never formally licensed the mark to a corporation does not conclusively establish anything about his intent to use the mark for himself. Rather, regardless of whether the individual owner or intended owner of the mark formally licensed his rights to a corporation, the key inquiry is whether the individual sufficiently policed and inspected the company's operations to guarantee the quality of the goods or services sold under the mark to the public. *See Pneutek, Inc. v. Scherr*, 211 U.S.P.Q. (BNA) 824, 833 (T.T.A.B. 1981). If so, "[o]wnership rights in a trademark or service mark may be acquired and maintained through the use of the mark by a controlled licensee even when the only use of the mark has been made, and is being made, by the licensee." TMEP § 1201.03(f).

### b. Assignment of an Intent-to-Use Application

As a theoretical matter, "[a] trademark exists only in connection with an on-going business. If the 'assignor' has made no trademark use of a designation, then there are no trademark rights to assign." 3 McCarthy on Trademarks and Unfair Competition § 18:6 (4th

ed.). Thus, under the Lanham Act, an intent-to-use application cannot be assigned before the applicant files a verified statement that he or she is using the mark, unless the part of the applicant's business that pertains to the mark is also assigned and that business is still "ongoing and existing." 15 U.S.C. § 1060(a)(1). Violating this "anti-trafficking rule" voids the assignment as well as the underlying application and resulting registration. *The Clorox Co. v. Chemical Bank*, 40 U.S.P.Q.2d (BNA) 1098, 1104 (T.T.A.B. 1996).

### c.  Cancellation of Trademark Registration

The Lanham Act provides that, in any action involving a registered mark, the court may determine the right to registration or order the cancellation of registrations. 15 U.S.C. § 1119.

### 2.  Evidence Regarding Application for and Ownership Rights Over the OCULU Mark

Here, it is undisputed that the Mr. Cecil filed an intent-to-use application for the OCULU trademark in his own name in 2011 rather than Innovate Media's name or Plaintiff's name. (Plaintiff did not exist at that point in time.) DUF Nos. 229, 231. Mr. Cecil never used or intended to use the OCULU trademark for himself, separate from Innovate Media and Oculu, LLC. DUF Nos. 233-234, 239, 241. Rather, in the beginning, it was Innovate Media that intended to use the mark. Innovate Media spent two years developing the services that Plaintiff now performs, paid for all marketing expenses for those services, and billed clients for those services. DUF Nos. 236, 238. For instance, in his application, Mr. Cecil attached a screen shot of Innovate Media's www.oculu.com website as a specimen of use of the OCULU mark. DUF No. 230. Innovate Media reimbursed Mr. Cecil for the filing fees for the trademark application and paid for the trademark attorney who worked on the application. DUF No. 237.

It is also undisputed that, when Plaintiff spun off from Innovate Media in 2013, the corporate documents listed the OCULU trademark as an asset of Innovate Media which would be transferred to Plaintiff. DUF No. 245. Innovate Media also treated the OCULU trademark as its asset when it put up the trademark as collateral for a loan from a company called Bright Dusk in 2013. DUF No. 246. It is also undisputed that an assignment of the OCULU trademark from

Mr. Cecil to Plaintiff was registered in February 2014, on the same day that Plaintiff filed suit in this case. DUF No. 232.

Mr. Cecil's declaration, attached to Plaintiff's opposition to Defendant's motion for summary judgment, states that he orally licensed the OCULU trademark to Innovate Media while they were deciding whether to spin off their Oculu division into a separate entity. "Once the business structure of Oculu LLC was established, and once its ownership structure was set, [he] assigned the mark to Oculu LLC once and for all." Cecil Decl. ¶ 30. Mr. Cecil states that, as the majority owner of both Innovate Media and Oculu, LLC, he "was in a position to make these decisions unilaterally." *Id.*

Defendant objects to the declaration on the ground it contradicts Mr. Cecil's deposition testimony. When Mr. Cecil was deposed on this topic, he had trouble recalling exactly what discussions he had with the two other owners of Innovate Media about registering the trademark and had difficulty answering whether he had given Innovate Media permission to use the mark while still retaining ownership of it for himself or if he had given Innovate Media the right to use the mark while not retaining any rights for himself. When pushed, he stated that he intended to transfer his rights to Innovate Media, as opposed to merely licensing rights to Innovate Media and retaining ownership rights for himself as an individual. Cecil Dep. 306:2-308:5.

### 3. Analysis

#### a. Mr. Cecil's Bona Fide Intent to Use the OCULU Mark

The parties' discussion regarding Mr. Cecil's bona fide intent to use the OCULU mark for his own benefit, rather than for his company's benefit, revolves around their disagreement as to whether Mr. Cecil actually licensed the mark to Innovate Media. However, the relevant inquiry is whether Mr. Cecil controlled or intended to control the quality of Innovate Media's "Oculu" video delivery services, regardless of whether Mr. Cecil formally licensed his rights to Innovate Media. If he did not have sufficient control, then Mr. Cecil's application was void ab initio because he never had a bona fide intent to use the mark for his own benefit.

Here, Mr. Cecil states in his declaration that, "[s]ince Innovate Media Group's founding, I have managed and overseen hundreds of production projects for clients . . . . Under my

leadership, Innovate Media Group established and launched Oculu.com, a standalone online video platform . . . ." Cecil Decl. ¶ 4. This is sufficient to create a genuine issue of material fact as to whether Mr. Cecil sufficiently controlled Innovate Media's use of the mark.

### b. Whether Mr. Cecil Improperly Assigned His Intent-to-Use Application

If Mr. Cecil assigned the intent-to-use application to Innovate Media before filing a verified statement of use, then such an assignment, as well as the application and registration of the OCULU mark, would be void. The exception to the anti-trafficking rule does not apply here because Mr. Cecil never did any business using the OCULU mark on his own, separate from Innovate Media. Thus, Innovate Media could not have been Mr. Cecil's successor in any such business.

Here, it is not clear based on Mr. Cecil's equivocal deposition testimony whether Mr. Cecil assigned the application or not. Moreover, this argument was raised for the first time in Defendant's reply and Plaintiff has not had an opportunity to rebut it. Thus, summary judgment on the issue of whether Mr. Cecil assigned the application is inappropriate at this time.

### 4. Conclusion

Accordingly, the Court DENIES summary judgment on Defendant's cancellation counterclaim.

### B. Likelihood of Confusion

Defendant argues that, based on the undisputed facts, there is insufficient evidence of likelihood of forward or reverse confusion. MSJ at 7-18. The Court agrees.

### 1. Legal Standard

The test for "likelihood of confusion" requires the factfinder to determine whether a "reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Surfvivor Media*, 406 F.3d at 630. In order to make this determination, courts in the Ninth Circuit have applied an eight-factor test:

(1) the strength of the mark;

(2) the relatedness or proximity of the goods;

(3) the similarity of the marks;

(4) evidence of actual confusion;

(5) marketing channels used;

(6) the type of goods and the degree of care likely to be exercised by the purchaser;

(7) defendant's intent in selecting the mark; and

(8) likelihood of expansion of the product lines.

*See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). These factors, commonly referred to as the *Sleekcraft* factors, "are intended to act as 'guideposts' for determining whether a likelihood of consumer confusion exists, and are adaptable to specific cases." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 874 (9th Cir. 2014); *see also Eclipse Associates Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990) ("These tests were not meant to be requirements or hoops that a district court need jump through to make the determination.").

To survive a summary judgment motion, "the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor Media*, 406 F.3d at 631 (citing *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129-30, 1132 (9th Cir. 1998), which allowed a case to proceed past summary judgment when the plaintiff overwhelmingly satisfied three *Sleekcraft* factors). However, there must be sufficient evidence to permit a rational trier of fact to find that confusion is "probable," not merely "possible." *M2 Software, Inc., v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005).

The weight of each *Sleekcraft* factor differs depending on whether the plaintiff alleges forward confusion or reverse confusion. Forward and reverse confusion are two distinct types of trademark infringement. *Surfvivor Media*, 406 F.3d at 630. "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." *Id.* "[R]everse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Id.* Stated differently, reverse confusion involves a situation "when [the junior mark holder] saturates the market with a similar trademark and overwhelms [the senior mark holder]." *Stonefire Grill, Inc. v. FGF*

*Brands, Inc.*, 987 F. Supp. 2d 1023, 1047 (C.D. Cal. 2013) (internal quotation marks omitted). The Court will address forward confusion first and then reverse confusion.

### 2.  Forward Confusion

To avoid summary judgment on a forward confusion claim, a plaintiff must raise a material question of fact regarding whether the buying public is likely to believe that the plaintiff was either the source or sponsor of defendant's product. *Surfvivor Media*, 406 F.3d at 630. Plaintiff has not presented any evidence in support of a forward confusion theory of liability. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment on the forward confusion theory.

### 3.  Reverse Confusion

To survive a summary judgment motion on a reverse confusion claim, a plaintiff must present evidence raising a question of material fact as to whether consumers are likely to believe that Defendant Oculus is either the source or sponsor of Plaintiff Oculu's services. *See Surfvivor Media*, 406 F.3d at 630. Here, the Court holds, that standard is not met.

#### a.  Strength of the Mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999). To determine the strength of a mark, courts examine the mark's "conceptual strength" and "commercial strength." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011).

"Conceptual strength involves classification of a mark 'along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful.'" *Id.* (quoting *Brookfield*, 174 F.3d at 1058). "The two strongest sets of marks are 'arbitrary' and 'fanciful' marks . . . . 'Arbitrary' marks are common words that have no connection with the actual product—for example, 'Dutch Boy' paint. 'Fanciful' marks consist of 'coined phrases' that also have no commonly known connection with the product at hand. Examples of fanciful marks include 'Kodak' cameras or 'Aveda' skin care products." *Survivor Media*, 406 F.3d at

631-32 (internal citations omitted). In the middle of the spectrum are "suggestive" marks, which require the exercise of some imagination in order to associate the mark with the product. *Id.* at 632. "Examples include 'Slickcraft' boats or 'Air Care,' for a service that maintains medical equipment for administering oxygen." *Id.* "Descriptive" marks "define a particular characteristic of the product in a way that does not require any exercise of the imagination. . . . Because these marks merely describe a characteristic of the product, they do not receive any trademark protection unless they acquire sufficient 'secondary meaning' to create an association between the mark and the product." *Id.* "Generic" marks simply describe the product in its entirety and are not entitled to trademark protection. *Id.* "Examples include 'Liquid controls' for equipment that dispenses liquid, or 'Multistate Bar Examination' for a bar examination that may be taken across multiple states." *Id.*

Locating the mark on the spectrum is not the end of the inquiry. The second step is to evaluate the commercial strength of the mark. "Commercial strength is based on 'actual marketplace recognition.'" *Network Automation*, 638 F.3d at 1149 (quoting *Brookfield*, 174 F.3d at 1058).[4]  Various factors can increase the strength of a conceptually weak mark. For instance, "advertising expenditures can transform a suggestive mark into a strong mark." *Brookfield*, 174 F.3d at 1058. So can factors such as the length of exclusive use and public recognition. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). On the other hand, "[u]se of similar marks by third-party companies in the relevant industry weakens the mark at issue." *M2 Software*, 421 F.3d at 1088.

---

[4] Courts sort marks into these five categories in in two different contexts: to determine a trademark's validity and to determine the strength of the mark for purposes of determining whether there is a likelihood of confusion in a trademark infringement case. In the validity context, arbitrary, fanciful, and suggestive marks, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). However, even though a suggestive mark is inherently distinctive in the validity context, a suggestive mark is not necessarily a strong mark in the strength of the mark/likelihood of confusion context. *Brookfield*, 174 F.3d at 1058 ("[U]nlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak."); *see also Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) ("[A]n incontestable status does not alone establish a strong mark.").

"In an infringement case involving 'forward' confusion, a more well-known senior mark suggests greater likelihood of confusion because a junior user's mark is more likely to be associated with a famous mark. In a reverse confusion case . . . we must focus on the strength of the *junior* user's mark" because a strong junior mark may overwhelm the senior mark and confuse the senior user's customers. *Dreamwerks*, 142 F.3d at 1130 n.5 (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 959 (7th Cir. 1992)). That said, the strength of the senior user's mark is still relevant, as the senior user must still show that its mark deserves protection. *See Surfvivor Media*, 406 F.3d at 631 n.3; *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 n.5 (9th Cir. 2002); *Dreamwerks*, 142 F.3d at 1130-31.

Here, both marks are derived from the word "oculus," which is Latin for "eye" and which is also an architectural term for a round window. The jury may conclude that, to the extent that "Oculu" is a made-up word, it may be fanciful. Or, it may be suggestive, since it takes a little imagination to connect a word that connotes an eye or a round window to online video delivery. For similar reasons, "Oculus" could be arbitrary or suggestive. Thus, in terms of conceptual strength, both marks are strong or moderately strong.

With regard to commercial strength, Defendant asserts that Plaintiff's mark is weak and unrecognized in the marketplace because it has no meaningful market share in the video production / video hosting / pre-roll video advertising industry and has invested less than $55,000 in the last three years to market and promote its business. DUF No. 93; Cecil Dep. 144:1-153:17. Moreover, Mr. Cecil was aware of other "Oculus" companies or brands before adopting the name "Oculu," DUF No. 141, and there are currently over 400 businesses that have registered or incorporated under the name Oculus in the United States, DUF No. 138. (The Court notes, though, that Defendant has not specified how many of these businesses are using the name Oculus in the same industry as Oculu.)

Plaintiff, on the other hand, asserts that, although it is not as well-known as Defendant, its mark is strong. First, according to its CEO Mr. Cecil, it has sold its services to over 500 clients nationwide, including two Fortune 500 companies and other well-known companies. Second, it

has also used its mark continuously since February 2011 at trade shows and on its website in conjunction with its online video delivery services. MSJ Opp'n at 16; Cecil Decl. ¶ 25.[5]

It is clear from this record that Plaintiff has an inherently distinctive and protectable mark and that Defendant's mark is better known than Plaintiff's, which support a finding of likelihood of confusion in a reverse confusion case. The strength of the mark factor is not dispositive, however. Thus, the Court continues with its analysis of other *Sleekcraft* factors.

### b.  Similarity of the Marks

"The similarity of the marks is 'a critical question in the likelihood-of-confusion analysis.'" *La Quinta Worldwide*, 762 F.3d at 875 (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000)). "To assess similarity, we compare the two marks in terms of sight, sound, and meaning, considering the marks 'as a whole, as [they] appear in the marketplace.'" *Id.* (quoting *M2 Software*, 421 F.3d at 1082 (alterations in original)). "[T]he amount of similarity required to support a likelihood of confusion declines as the services themselves become increasingly similar." *Id.* at 876. "[S]imilarities are weighed more heavily than differences." *GoTo.com*, 202 F.3d at 1206.

Plaintiff's mark is "oculu" (pronounced "ok-yuh-loo"). DUF No. 126. Plaintiff's mark typically appears in all lower-case letters with a multi-colored, banded pattern filling the letters. DUF Nos. 127, 129. Plaintiff's mark appears on Plaintiff's website, which describes Plaintiff's online video hosting business. DUF No. 128.

//
//
//
//
//
//
//

---

[5] Defendant's lack of foundation objection is overruled. *See* Def.'s Objections to Evidence (Dkt. 139), at 39.



Defendant's mark is made up of the Latin word "oculus" – meaning eye – and it is pronounced: "ok-yuh-luhs." DUF No. 130. Defendant's OCULUS VR logo appears with an uppercase "O," and uppercase "VR," in a black font called "Cabin" with a black stylized eye with a blue pupil. DUF Nos. 132, 133. Defendant's mark appears on its website, which describes the Samsung Gear Innovator Edition and the DK2, both virtual reality headsets so far aimed at developers rather than consumers. King Decl. Ex. 27 (Dkt. 95-9).



Because the two marks sound similar, are spelled similarly, and use similar sans-serif fonts, a reasonable jury could conclude that the marks are sufficiently similar to weigh in favor of finding likelihood of confusion. A reasonable jury could also conclude the opposite based on the different thicknesses of the letters in the mark, the different colors used, and how they appear in the marketplace. Thus, this factor is a draw.

### c.  Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft Boats*, 599 F.2d at 352. "However, due to 'the difficulty of garnering such evidence, the failure to prove instances of actual confusion is not dispositive. . . . [T]his factor is weighed heavily only when . . . the particular circumstances indicate such evidence should have been available.'" *La Quinta Worldwide*, 762 F.3d at 876.

Here, Plaintiff has presented no competent evidence that any customers were actually confused about the relationship between Oculu and Oculus.[6] To the extent that Plaintiff is relying on the Google search engine's propensity to auto-correct searches for "oculu" to searches for "oculus" or to intermingle "oculu" and "oculus" search results, such evidence is not evidence of customer confusion. *Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF HRL, 2011 WL 2749576, at *3 (N.D. Cal. July 14, 2011); *Dahl v. Swift Distribution, Inc.*, No. CV 10-00551 SJO(RZX), 2010 WL 1458957, at *9 (C.D. Cal. Apr. 1, 2010).

The lack of any competent evidence of actual confusion despite the fact that the marks have co-existed for three years thus weighs against a finding of likelihood of confusion. However, this factor is not dispositive.

---

[6] In fact, Plaintiff's only evidence of actual confusion is its CEO Mr. Cecil's declaration that

> I have received numerous contacts at both a venture capitalist conference who asked me if they could "demo the goggles," as well as fielding questions from a client wondering during contract negotiations why they were "spending money on virtual reality," and numerous customers of Oculu inquiring as to whether Oculu was being acquired by Facebook or was moving into the virtual reality market.

Cecil Decl. ¶ 24. Defendant objects that this evidence is inadmissible hearsay. Def.'s Objections to Evidence, at 35. The Court agrees.

### d. Relatedness of the Goods and Likelihood of Expansion of Product Lines

These two factors are the most contested. Because the facts going to these two factors are closely intertwined, the Court will discuss them together.

### i. Evidence of Plaintiff's Current and Future Goods and Services

With regard to current products and services, it is undisputed that Plaintiff helps businesses display web-based, streaming video and pre-roll ads on computers and mobile devices. There is no evidence that Plaintiff produces video content on its own. Rather, the evidence shows that Plaintiff's customers bring their own content to Plaintiff and Plaintiff merely helps them display the content properly on their websites and, in some instances, helps customers monetize that display by setting up pre-roll advertising for them.

There is scant evidence that Plaintiff is likely to expand into delivering video via VR devices. Plaintiff admitted in its responses to Defendant's interrogatories that Plaintiff did not develop virtual reality uses for its product or services prior to the filing of this lawsuit on February 10, 2014. DUF No. 163. Prior to the filing of this lawsuit on February 10, 2014, Plaintiff had no employees or contractors developing virtual reality uses for its products or services. DUF No. 164.

In July 2014, after the lawsuit was filed, Oculu issued a press release announcing "initial development of a new video player to serve pre-roll ads directly into platforms using virtual reality (VR) technology." King Decl. Ex. 34. In November 2014, Plaintiff posted a blog post on its website entitled, "Is Virtual Reality the next Frontier for Video Serving and Pre Roll Advertising?" King Decl. Ex. 73. The blog post informed readers that, "It's looking like VR platforms will be the new frontier for serving online video. As a marketer it's probably smart to be aware of these advancements so you can anticipate their impact on your organization." *Id.* at 2. The blog post also states that "OCULU® is working to enhance[] its platform so it will deliver pre-roll advertising messages right into virtual reality technology on top of our player." *Id.*

Mr. Cecil states in his declaration that "Oculu is actively developing a new video player that will be capable of serving preroll ads directly into platforms using virtual reality technology. Once that is accomplished, the online videos streamed by Oculu will be accessible on virtual reality headsets such as those being developed by Oculus." Cecil Decl. ¶ 11. However, there is no evidence that Plaintiff has set aside any portion of its budget to work on VR services. There is also no evidence that it has dedicated any portion of its employees' time to working on VR. DUF Nos. 173-174. Plaintiff does not own any VR hardware on which it could conduct or has conducted testing. DUF No. 176. Plaintiff also has not set any benchmarks for the completion of VR related projects. DUF No. 175.

### ii.  Evidence of Defendant's Current and Future Goods and Services

Defendant currently produces VR hardware (headsets and associated components), firmware, and software. Defendant also produces certain video and video-like content which can be viewed using VR technology, including immersive video game environments, VR short films which pause and re-start depending on whether the user is paying attention, and an experience known as 360 Video which allows a user to watch pre-recorded non-VR movies and trailers (which keep playing regardless of whether the user is looking at them) in 360-degree simulated environments such as a drive-in movie theater on the moon. Malamed Dep. 27:2-31:2.

There currently is no mechanism developed by Defendant to stream or watch web-based videos through Defendant's Rift headsets. DUF No. 117. Defendant's Rift headset can only play content that is developed specifically for virtual reality and which is resident on the computer to which the headset is connected. DUF No. 118. Oculus does not currently do VR advertising. DUF No. 177. Mr. Luckey, the founder of Oculus, testified at his deposition that Oculus is not currently involved in discussions about virtual reality advertising. He testified, "Right now there's . . . no obvious way to do virtual reality advertising. You know, just taking a video and just putting it in front of content before you can view it isn't a good experience in VR. It's a pretty – it would be a terrible way to do advertising, and I don't think anyone is going to do it that way if they did it." Luckey Dep. 98:6-99:10.

However, Defendant's Chief Operating Officer ("COO") Laird Malamed testified that Defendant is in the process of developing an online app store. Third-party developers will be able to create apps that consumers will be able to download from the Oculus app store and use on Oculus's VR devices. Malamed Dep. 31:19-32:14.[7]

### iii. Legal Standard

A defendant can be held liable for trademark infringement even if the defendant does not sell goods or services that directly compete with the plaintiff's. The zone of protection guaranteed to the holder of a trademark includes products that are non-competitive but "related" in the eyes of the reasonable consumer as well as markets to which a consumer would reasonably expect the trademark holder to expand. *Brookfield*, 174 F.3d at 1047, 1051; 4 McCarthy on Trademarks and Unfair Competition §§ 24:17, 24:19, 24:20 (4th ed.); *see also Applied Info.*, 511 F.3d at 971 (a plaintiff can seek relief under the Lanham Act for a defendant's use of an infringing mark on goods or services not specified in the plaintiff's registration, so long as the defendant's use is likely to cause confusion with the plaintiff's use of the mark). The key inquiry in a reverse confusion case featuring non-competitive goods or services is whether the reasonably prudent purchaser is likely to be confused about whether the junior user approves of or is sponsoring the senior user's products or if there is some other affiliation or connection

---

[7] Besides Mr. Malamed's deposition testimony, Plaintiff also offers two other categories of evidence that Defendant will expand into assisting businesses in delivering streaming video content or advertising through VR devices:

(1) Mr. Cecil's assertion that "[t]here is no question that Oculus intends to expand the utility of its virtual reality system to include advertising and marketing activities, training and education videos, the presentation of feature films and other entertainment options. Many of these options will be delivered over the Internet," Cecil Decl. ¶ 23; and

(2) various news articles from third parties about Samsung partnering with the NBA to record basketball games using VR cameras, Cecil Decl. Exs. A-C (Dkts. 109-3 to 109-5); HTC and Sony launching VR headsets, *id.* Ex. G (Dkt. 109-9); Oculus's announcement of Oculus Platform, a store for developers to distribute VR apps and experiences, *id.* Ex. D (Dkt. 109-6); Oculus's release of a short VR film at the Sundance Film Festival, *id.* Ex. E (Dkt. 109-7); and Facebook CEO Mark Zuckerberg's prediction that VR devices will one day allow people to capture 3D scenes "[j]ust like we capture photos and videos today and then share them on the Internet," *id.* Ex. F (Dkt. 109-8).

This evidence is inadmissible, as Mr. Cecil's statement lacks foundation and the news articles are inadmissible hearsay. Accordingly, the Court considers only Mr. Malamed's testimony.

between junior and senior users. *See* 4 McCarthy on Trademarks and Unfair Competition § 24:1 (4th ed.).

"The standard for deciding whether the parties' goods or services are 'related' is whether customers are 'likely to associate' the two product lines." *Surfvivor Media*, 406 F.3d at 633. For this factor, the Court considers "whether the buying public could reasonably conclude that the products came from the same source." *Id.* "The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Network Automation*, 638 F.3d at 1150.

In determining whether goods or services are related, "the relatedness of each company's prime directive isn't relevant." *Dreamwerks*, 142 F.3d at 1131. In *Dreamwerks*, for instance, the Ninth Circuit disapproved of a district court's emphasis on the fact that Dreamwerks, the senior user, organized sci-fi fan conventions targeted at *Star Trek* fans while Dreamworks, the junior user, made movies for a much broader audience. *Id.* Rather, the focus, in a reverse confusion case, should be on the senior user's customers and whether they are likely to associate the senior user's goods and services with the junior user. There, the Ninth Circuit held that Dreamwerks's and Dreamworks's products were related because, aside from making movies, large movie studios such as Dreamworks often sold merchandise and organized events. *Id.*

The likelihood of expansion factor weighs in favor of finding infringement only when there is "a *strong* possibility of expansion into competing markets." *M2 Software*, 421 F.3d at 1085 (rejecting plaintiff's argument that it was likely to expand into retail distribution of audio CDs where plaintiff only sold 215 CDs over a ten-year period); *see also Sleekcraft*, 599 F.2d at 354 (holding that likelihood of expansion factor weighed in favor of infringement where both parties were diversifying their boat model lines).

### iv. Analysis

Plaintiff argues that the parties' current products and services should be considered related because they all fall into the category of "offer[ing] a means (software) to deliver video to end users." Opp'n to MSJ at 6. This argument is not supported by the facts or the law. Defendant does not currently offer web-based video delivery services or products to consumers.

Its 360 Video and VR movie products can only be used with its VR headsets, which are only available to developers at this time. Plaintiff, on the other hand, helps businesses display videos on the Internet, which end users can view using their computers or mobile devices. The parties' current products and services are not complementary. They are also very different in terms of functionality and in terms of their customers. Thus, they are not related. *See Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1126 (S.D. Cal. 2014) (finding proximity of goods factor did not weigh in favor of likelihood of confusion where Google's HANGOUTS product allowed real-time, live video-conferencing and instant messaging while HANGINOUT only allowed users to post and view pre-recorded video messages or profiles); *Instant Media, Inc. v. Microsoft Corp.*, No. C 07-02639 SBA, 2007 WL 2318948, at *12 (N.D. Cal. Aug. 13, 2007) (finding proximity of goods did not weigh in favor of likelihood of confusion where Microsoft's Windows Live Messenger software had some video capability but was fundamentally an instant messaging system while Instant Media's software was a video player).

Plaintiff also argues that, despite the fact that Defendant's current focus is developing VR hardware, firmware, and software and Plaintiff's current focus is delivering streaming video through computers and mobile devices, both parties are heading toward delivering video content and advertising through VR devices. Opp'n to MSJ at 7. Plaintiff claims that it is actively developing a video player that will allow it to deliver video and pre-roll advertising via VR technology. Aside from two press releases and Mr. Cecil's broad statement that it is doing so, there is no evidence that Plaintiff is actually taking concrete steps toward that goal. However, at the summary judgment stage, the Court does not weigh the credibility of witnesses or weigh the evidence. Therefore, reading the evidence with all reasonable inferences in Plaintiff's favor, the Court assumes that Plaintiff is in fact in the early stages of working toward developing a video player that will play videos on VR devices.

The record shows that Defendant is working on an online app store. It is reasonable to infer that the app store will allow consumers to purchase apps to use on VR devices. Given that Defendant is currently developing VR and non-VR movie watching capabilities, it is also reasonable to infer that consumers will eventually be able to view videos, including web-based

videos, through Oculus's VR devices. However, it is unclear what products and services Defendant will offer in the course of developing that VR ecosystem. For instance, it is unknown whether Defendant will be developing a video player or Internet browser app of its own, as opposed to merely providing the marketplace for other developers to do so. On this record, a reasonable jury could not find that there is a "strong" possibility of Plaintiff and Defendant becoming direct competitors.

Thus, the relatedness of goods and likelihood of expansion factors largely weigh against finding likelihood of confusion.

### e. Types of Goods or Services and Degree of Care Likely Exercised by Purchasers

Under this factor the Court considers "the type of good or service offered and the degree of care one would expect from 'the average buyer exercising ordinary caution.'" *La Quinta Worldwide*, 762 F.3d at 877 (quoting *Sleekcraft*, 599 F.2d at 353). "Low consumer care . . . increases the likelihood of confusion." *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004). When a buyer has expertise in the field or when the good or service at issue is expensive, buyers are likely to exercise a higher standard of care, which lessens the likelihood of confusion, but does not eliminate the risk entirely. *Sleekcraft*, 599 F.2d at 353.

Here, Plaintiff's customers are businesses looking for assistance displaying streaming videos on their websites and monetizing that display; those customers often send their IT and marketing professionals to interface with Plaintiff to evaluate Plaintiff's services before signing up as customers. DUF No. 60. Defendant's current customers are tech-savvy developers who are designing VR video games, apps, and experiences for retail end users. It is unlikely that these types of sophisticated purchasers will confuse Plaintiff's services with Defendant's goods and services.

If Plaintiff's and Defendant's businesses expand in the way that Plaintiff predicts, Plaintiff's customers would likely remain the same group of people. However, if Defendant begins using its mark with more mainstream audiences as Plaintiff predicts, Plaintiff's

customers and potential customers may become more familiar with it, increasing the likelihood that they will mistake Oculu for Oculus. Depending on how the jury views the evidence regarding relatedness of goods and likelihood of expansion of product lines, a reasonable jury could have different views about how likely the relevant buying public is to think that there is some connection between Plaintiff's and Defendant's marks. Thus, this factor could potentially weigh in favor of finding likelihood of confusion.

### f.  Marketing Channels Used

When examining the marketing channels factor, the Court considers the location of where the goods or services are sold as well as the sales and marketing methods employed. *See La Quinta Worldwide*, 762 F.3d at 876-77. "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. "However, this factor becomes less important when the marketing channel is less obscure. Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1151.

The record shows that Defendant's main marketing efforts involve attending and exhibiting at trade shows and conferences and generating press coverage. Defendant has appeared at video game trade shows such as E3, CES, GDC, and SXSW, and Facebook's "f8" conference for software developers. DUF No. 26. Plaintiff, on the other hand, has never exhibited at E3 or CES. Instead, Plaintiff has attended four marketing conferences, LeadsCon, Conversion Conference, Ad Tech, and Internet Marketer and regularly attends LeadsCon and Conversion Conference. DUF Nos. 142-143. The only event attended by both parties was VC in the OC in 2013, an investor networking event that helps technology companies in Orange County connect with potential investors. Both Plaintiff and Defendant attended as exhibitors. Defendant's CEO gave the Entrepreneur Keynote speech at the event. DUF Nos. 144-146.

Both Plaintiff and Defendant have websites with similar domain names, through which they sell their respective goods and services. Both advertise on social media such as Facebook and LinkedIn. Cecil Decl. ¶ 27. Plaintiff publishes a blog on its website and purchases keyword advertising from Google. DUF Nos. 147, 179-181. Defendant does not. DUF Nos. 137, 188.

Here, the only areas of overlap are the fact that Defendant and Plaintiff both have websites and social media accounts and attended VC in the OC. Given *Network Automation*, the fact that both parties have Internet presence is not sufficient by itself for this factor to weigh in Plaintiff's favor because the Internet is a ubiquitous marketing channel. Their attendance at VC in the OC by itself is not sufficient to tip the scale, given that VC in the OC is only one marketing channel among many for both parties. Ultimately, this factor weighs against a finding of likelihood of confusion. However it (likely) deserves less weight than some of the other factors.

### g.  Oculus's Intent in Selecting Its Mark

"[A]n intent to confuse consumers is not required for a finding of trademark infringement," *Brookfield*, 174 F.3d at 1059. However, "intent to deceive is strong evidence of a likelihood of confusion," *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999), because "the alleged infringer's judgment as to what is likely to be confusing . . . may well be accurate." *Entrepreneur Media*, 279 F.3d at 1148. In a reverse confusion case, "the intent inquiry must . . . focus on whether the defendant was aware of the senior user's use of the mark in question, or whether the defendant conducted an adequate name search for other companies marketing similar goods or services under that mark." *Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir. 2000); *see Cohn*, 281 F.3d at 841 n.5 (citing *Commerce* and finding intent factor neutral in a reverse confusion case because the plaintiff did not present evidence that the defendant intended to copy's plaintiff's mark or that defendant should have known about plaintiff's senior trademark rights). "Adopting a designation with knowledge of its trademark status permits a presumption of intent to deceive." *Interstellar*, 184 F.3d at 1111. "Good faith is less probative of the likelihood of confusion, [although it] may be given considerable weight in fashioning a remedy." *Sleekcraft*, 599 F.2d at 354.

Here, it is undisputed that Mr. Luckey did not have actual knowledge about Oculu's trademark rights when he named his company "Oculus" in 2012. DUF No. 157. In early 2012, when he was choosing a name for the company, Mr. Luckey performed a search for the word "Oculus" as well as for related words, including "Ocular" and "Oculux" to identify a name that

nobody else who was doing virtual reality, optical, or gaming-related work was using. He did not come across any companies using the word "Oculus" in those areas. DUF Nos. 158-159. He never performed a search for the word "Oculu." He did not come across Oculu's website at any time during his name search for companies named "Oculus" or "Ocular" or "Oculux" or other similar words in 2012. DUF Nos. 160-161. Neither he nor Defendant learned of Oculu's business or its trademark until Oculu filed this lawsuit. DUF No. 162.

Based on these facts, the most that can be said in Plaintiff's favor is that Mr. Luckey was on constructive notice because Oculu's trademark was issued on August 16, 2011 and that he should have done a more thorough and careful review of the search results on the USPTO website. Given the lack of evidence that Defendant actually intended to confuse the public by adopting a similar mark, as opposed to being merely negligent about whether its mark might be similar to another person's mark, the evidence of intent in this case is not helpful in determining whether the buying public is likely to be confused. Thus, this factor is neutral.

### h.  Conclusion

Here, the factors that weigh most strongly in Plaintiff's favor are the strength of the marks and the similarity of the marks factors. The evidence of actual confusion factor weighs in favor of Defendant. The marketing channels and alleged infringer's intent factors are largely unhelpful.

In this case, the question of whether a jury could reasonably find likelihood of confusion comes down to whether a jury could reasonably find that a reasonable consumer of Plaintiff's services would view the parties' goods and services as somehow related such that the consumer is likely to be confused about whether Defendant was associated with Plaintiff's services. As discussed above, the evidence before the Court does not support a finding that Plaintiff's and Defendant's goods and services are currently related, nor does it support a finding that Plaintiff and Defendant are likely to become direct competitors.

Thus, Plaintiff's trademark infringement claim depends on the jury reasonably finding that Plaintiff's and Defendant's goods and services will one day be complementary even though they are not related today. Plaintiff envisions a future in which it will help customers display

web-based videos that can be viewed by end users using apps purchased from Defendant's VR app store on Defendant's VR devices. It fears that its customers or potential customers will then think that Plaintiff's services are somehow sponsored by or connected with Defendant. If a day should come when Plaintiff is actually in that position or is on the verge of being in that position, it may have a reverse confusion claim at that time. As of today, however, Plaintiff has offered only very thin evidence regarding where Plaintiff and Defendant are likely to expand— essentially, just the word of a representative from each company stating what each company is developing internally. Plaintiff has not offered competent evidence of release dates, timetables, or business plans, or other documents or testimony that could show concretely what goods or services Plaintiff and Defendant will be using their marks on in the future and when. Moreover, Plaintiff has pointed to no legal authority that a trademark infringement claim can succeed based on anticipatory infringement that is as speculative as is the case here. Even applying the *Sleekcraft* standard and reading the record in the light most favorable to Plaintiff, the Court cannot find a genuine issue of material fact as to likelihood of confusion. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's reverse confusion theory.

## C. Monetary Recovery

Defendant argues that both Plaintiff's lost profits theory and its unjust enrichment theory must fail because Plaintiff has only speculative and otherwise inadmissible evidence of any profits lost by Plaintiff or gained by Defendant; moreover, it has no competent evidence that any of the profits lost or gained were connected to Defendant's allegedly infringing conduct. MSJ at 20-21. The Court addresses each of Plaintiff's theories for monetary recovery in turn.

### 1. Legal Standard

Under the Lanham Act, a plaintiff may recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).  A plaintiff's recovery of a monetary award is "subject to the principles of equity," *id.*, meaning "that such a remedy should not be granted as a matter of right." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993).

To recover actual damages, plaintiff must demonstrate both the fact that it suffered actual damages and the amount of the damages with reasonable certainty. *Id.* at 1407-08. Many courts have denied a monetary award in infringement cases when damages are remote and speculative. *Id.* at 1408 (collecting cases). On the other hand, once actual damages have been proven with reasonable certainty, the court has the discretion to enter judgment for up to three times the amount of actual damages, "according to the circumstances of the case." 15 U.S.C. § 1117(a).

To assess the defendant's profits for Lanham Act purposes, the plaintiff's burden is to establish with reasonable certainty the defendant's gross profits, which are then presumed to be the result of infringing activity. The burden then shifts to the defendant to show "which, of any of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Lindy Pen*, 982 F.2d at 1408. In the end, "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a).

In exercising equity to award defendant's profits and/or plaintiff's actual damages, "the court must fashion a remedy wherein the defendant may 'not retain the fruits, if any, of unauthorized trademark use or continue that use [and the] plaintiff is not . . . [given] a windfall.'" *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015) (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 918 (Fed. Cir. 1984)).

## 2.  Actual Damages: Lost Profits Theory

Plaintiff claims that it has suffered a drop in revenue because of a significant drop in the number of customers, which in turn was caused by a drop in website traffic, which in turn was caused by a drop in Google search hits. *See* Cecil Decl. ¶ 29. Plaintiff's only evidence that the drop in Google search hits was caused by Defendant's allegedly infringing conduct is its expert witness David Drews's report. Mr. Drews estimates that Defendant's crowding out of Plaintiff's brand has resulted and will result in Plaintiff losing $720,182 in profits between June 2012, when Mr. Luckey first exhibited his VR headset at E3, and December 2016. Mr. Drews's

opinion is based on his observation that the number of unique visits and organic search engine click-throughs to Plaintiff's website and the number of free trial customer sign-ups and conversions to paid customer accounts decreased after Oculus made its public debut. He estimates that Plaintiff lost about 360 paying customer accounts after June 2012. Since the average customer was active for three years and generated $75 of revenue per month, he estimates that Plaintiff lost approximately $918,000. Taking into account Plaintiff's gross profit margin and pre-judgment interest, Mr. Drews concludes that Plaintiff will have lost $720,182 by December 2016 because of Defendant using the name "Oculus." Peterson Conf. Decl. in Support of MIL Ex. 7 ("Drews Expert Report") (Dkt. 100), at 10-13.

Defendant argues that Mr. Drews's opinion is based on a number of factually unsupported assumptions and therefore is inadmissible under Federal Rule of Evidence 702 and insufficient to prove a reasonably certain amount of damages. The Court agrees.

An expert witness may testify only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The court serves a special "gatekeeping" function with respect to expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). The court must make an initial assessment of the proposed expert testimony to ensure that it "rests on a reliable foundation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "'An expert's opinions that are without factual basis and are based on speculation or conjecture' are inadmissible at trial and are 'inappropriate material for consideration on a motion for summary judgment.'" *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1149 n.4 (9th Cir. 2011) (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008)).

Defendant's chief complaints are the following:

(1) Mr. Drews assumes that Oculus was 100% responsible for the decrease in Plaintiff's website traffic and Plaintiff's customers after June 2012 based solely on the fact that Oculus debuted at E3 in June 2012, which is unreasonable in light of all of the other possible reasons for the loss of web traffic and free trials identified by Defendant's rebuttal expert. MIL at 16.

(2) Mr. Drews relies on estimates of the number of free trials, the conversion rate to paid customers, average revenue per month per customer, and average duration of a customer account found in a Powerpoint slide that Plaintiff presented to investors in 2013 or 2014 and Mr. Cecil's mental impressions rather than Plaintiff's actual customer and financial data. *See* DUF Nos. 210-212; MIL at 16-18.

In opining that Oculus was the sole cause of the drop in web traffic (which then caused a drop in the number of customers), Mr. Drews states that he has "not been able to identify any other coinciding event or circumstance that could explain the above results." Drews Expert Report at 11. He does not explain which potential alternative reasons for the drop in website traffic he considered or how he ruled them out. Absent some sort of explanation, Mr. Drews's opinion appears to be based on nothing more than his observation that the timing of the drop in website traffic correlates to the timing of Oculus's June 2012 debut at E3. Lacking any factual basis beyond mere correlation, Mr. Drews's opinion on causation is speculative as well as misleading and unhelpful to this Court and to the jury. *ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.*, No. CV-11-01056-PHX-NVW, 2014 WL 99017, at *10 (D. Ariz. Jan. 10, 2014) (excluding an expert opinion equating correlation with causation without evidence). Accordingly, Mr. Drews's opinion is properly excluded under Federal Rules of Evidence 702 and 403.

Without Mr. Drews's opinion on causation, Plaintiff is left with raw data regarding its keyword advertising efforts, its search ranking, its number of click-throughs, and the number of free and paid customer accounts, which can be presented to the jury without Mr. Drews's assistance, and from which a jury can decide if the loss of customers can be attributed to Defendant and, if so, how many. Defendant's remaining objections to the Drews report—that it

is unreasonable to assume that 100% of the drop in web traffic is Defendant's fault and that the numbers of free trials and paid customers listed in Mr. Drews's report are factually incorrect— are arguments more appropriately presented to the jury.

Therefore, the Court GRANTS Defendant's Motion in Limine as to Mr. Drews's opinion on Plaintiff's lost profits damages theory, but DENIES Defendant's Motion for Summary Judgment as to that theory.

### 3. Disgorgement of Defendant's Profits: Unjust Enrichment Theory

Defendant argues that Plaintiff's unjust enrichment theory for disgorgement of profits is fails as a matter of law because Defendant did not act willfully, Defendant has yet to make a "profit" within the meaning of the Lanham Act, and because Mr. Drews's opinion about the amount of profits is based on speculation. MSJ at 21-23. Plaintiff responds that that Defendant had constructive notice about Oculu's prior-filed trademark registration and "profit" should be broadly construed. MSJ Opp'n at 20-23. The Court agrees with Defendant that disgorgement of profits is not available in this case.

Disgorgement of defendant's profits can be had both in cases where the plaintiff and the defendant are direct competitors—in which case the defendant's profits are often treated as an approximation of the plaintiff's lost profits—and in cases where they are not direct competitors. Disgorgement is available in the latter cases based on the rationales that a defendant who has willfully infringed the plaintiff's trademark should not be unjustly enriched and that disgorgement serves as a deterrent to future infringement. Thus, unless the plaintiff only seeks to recover the defendant's profits as a measure of its own lost sales, the plaintiff can only recover the defendant's profits if the defendant willfully infringed. *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995), *as amended on denial of reh'g* (Feb. 15, 1996). Here, Plaintiff's estimate of Defendant's "profits" dwarfs its estimate of its own lost sales. Plaintiff is clearly not seeking Defendant's profits just as a measure of its own lost sales and thus must show that Defendant willfully infringed in order to recover the difference.

With regard to willfulness, in *Hydramedia Corp. v. Hydra Media Grp. Inc.*, 392 F. App'x 522 (9th Cir. 2010), the Ninth Circuit affirmed a district court's refusal to award an accounting

of defendant's profits in a reverse confusion case on the ground that the defendant "was not trading off Plaintiff's name" and that the defendant's infringement was not willful. *Id.* at 523. In *Lindy Pen*, the Ninth Circuit affirmed another district court's refusal to award an accounting of defendant's profits in a reverse confusion case where the plaintiff's mark was weak and the defendant "Bic's major position in the pen industry ma[de] it clear that it was not [willfully] trading on [plaintiff] Lindy's relatively obscure name." 982 F.2d at 1406. The *Lindy Pen* court acknowledged that, in *Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982), the Ninth Circuit found it an abuse of discretion to deny an accounting of profits when the defendant's infringement yielded financial rewards. However, where there is no willful infringement, the deterrence rationale articulated in *Playboy* is inapposite. *Lindy Pen*, 982 F.2d at 1406-07.

Here, as discussed above, *see supra* Part III.B.3.g, Defendant did not know of Plaintiff's existence until this litigation. Defendant's infringing conduct was, at worst, negligent. As another district court in the Ninth Circuit as held, "[t]o the extent that Plaintiffs argue that disgorgement is available under the circumstances here in a reverse confusion case, where Defendants negligently failed to investigate senior rights before adopting a mark but did not willfully infringe, this cannot be reconciled with the language of *Lindy Pen.*" *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 2013 WL 4528539, at *21 (N.D. Cal. Aug. 23, 2013). Thus, Plaintiff cannot recover Defendant's profits because it cannot demonstrate that Defendant's conduct was willful.

Plaintiff also cannot recover Defendant's profits because it cannot demonstrate that Defendant earned "profits" within the meaning of the Lanham Act. Plaintiff's unjust enrichment theory, as articulated by its expert witness Mr. Drews, is based on Facebook's valuation of Defendant's "Tradename and other" asset, which does not constitute "profits" within the meaning of the Lanham Act. The Lanham Act states, "In assessing profits the plaintiff shall be required to prove defendant's *sales* only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a) (emphasis added). The Ninth Circuit's model jury instruction on defendant's profits follows the statutory language. 9th Cir. Model Civ. Jury Inst. No. 15.26.

Here, the undisputed evidence in the record shows that the $132 million figure reflects Facebook's estimate of the future value of Defendant's tradename and "other" assets. DUF Nos. 222-223. Plaintiff has not provided any binding or persuasive legal authority that "defendant's profits" can be based on something so removed from the amount of defendant's sales. Nor has Plaintiff provided any evidence that the $132 million figure actually reflects some figure reflecting the volume of Defendant's sales of goods or services using an "Oculus" mark.

Accordingly, the Court GRANTS summary judgment in Defendant's favor on Plaintiff's unjust enrichment theory for disgorgement of profits and GRANTS Defendant's Motion in Limine as to Mr. Drews's opinion on that theory.

**IV. Disposition**

For the reasons discussed above, the Court ORDERS as follows:

(1) The Motion for Summary Judgment is GRANTED in Defendant's favor as to Plaintiff's forward and reverse confusion theories of trademark infringement liability and unjust enrichment theory for disgorgement of profits.

(2) The Motion for Summary Judgment is DENIED as to Defendant's cancellation counterclaim and Plaintiff's lost profits damages theory.

(3) The Motion in Limine is GRANTED as to Plaintiff's expert's opinions on Plaintiff's lost profits and unjust enrichment theories. Because the Court did not rely on Mr. Drews's opinion on likelihood of confusion, the Motion in Limine is DENIED AS MOOT with regard to that opinion, without prejudice to Defendant raising the same issue before trial.

DATED:  June 8, 2015

_David O. Carter_

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE